2007 OK CR 34

**Ricky Ray MALONE, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

No. D–2005–600.

Court of Criminal Appeals of Oklahoma.

Aug. 31, 2007.

Don. J. Gutteridge, Oklahoma City, OK, Cheryl A. Ramsey, Stillwater, OK, attorneys for defendant at trial.

Robert Schulte, District Attorney for Comanche County, Lawton, OK, Mark Clark, Assistant District Attorney, Walters, OK, attorneys for the State at trial.

James H. Lockard, Deputy Division Chief, Kathleen Smith, Capital Direct Appeals Division, Oklahoma Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

CHAPEL, Judge.

¶1 Ricky Ray Malone, Appellant, was tried by jury and convicted of First–Degree Malice Aforethought Murder, in violation of 21 O.S.2001, § 701.7(A), in the District Court of Comanche County, Case No. CF–2005–147.[1] In the sentencing phase, the jury recommended a death sentence for the murder, after finding three aggravating circumstances: 1) that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; 2) that there was a "probability" that Malone would "commit criminal acts of violence that would constitute a continuing threat to society"; and 3) that the "victim of the murder was a peace officer . . ., and such person was killed while in performance of official duty."[2] In accordance with the jury's recommendation, the trial court, the Honorable Mark R. Smith, sentenced Malone to death. Malone has properly perfected this direct appeal of his conviction and sentence.[3]

## *FACTS*

¶2 Around 6:20 a.m., on December 26, 2003, Abigail Robles was delivering newspapers in rural Cotton County, just east of Devol, Oklahoma. While driving on Booher

---

**1.** The killing of Oklahoma Highway Patrol Trooper Nikky J. Green was committed in Cotton County. Malone was originally charged in Cotton County District Court, Case No. CF–2004–1. Although defense counsel sought a change of venue in August of 2004, based upon the extensive publicity and notoriety of the case in Cotton County, this motion was denied. Defense counsel filed a second change of venue motion in February of 2005. At this time the parties agreed that a delay in the completion of the defense expert witness's report had made it impossible to try the case during Cotton County's spring jury term. Because the State did not want to wait for the next Cotton County jury term in the fall, the prosecutor agreed to confess Malone's change of venue motion and have the case transferred to Comanche County, to be tried in May of 2005.

**2.** *See* 21 O.S.2001, § 701.12(5), (7) and (8), respectively.

**3.** Malone's Petition in Error was timely filed on November 14, 2005. On July 10, 2006, Malone filed his Brief and an Application for an Evidentiary Hearing on Sixth Amendment Claims. On November 13, 2006, the State filed its Brief and a Response to Defendant's Application for Evidentiary Hearing. Malone filed a Reply Brief on December 4, 2006. Oral argument before this Court was held on April 24, 2007.

Road, she came across a parked white car on the side of the dirt road.[4] The white male driver was laying in the front seat, but he was not moving, and his feet were hanging outside the car. Robles thought he might be dead. She drove to the home of Oklahoma Highway Patrol ("OHP") Trooper Nik Green, which was less than a mile away, to ask for his help. Green had been sleeping, but answered the door, listened to Robles's story, told her not to worry about waking him, and reassured her that he would check out the situation for her.

¶ 3 At 6:28 a.m., Trooper Green telephoned OHP dispatch in Lawton and reported what Robles had seen. Green was not scheduled to be on duty that day until 9:00 a.m., but when he learned that the on-duty Cotton County trooper was not available, he volunteered to go check out the situation himself. He went on duty at 6:37 a.m. and informed dispatch shortly thereafter that he had arrived at the scene and discovered a white four-door vehicle and a white male. Green attempted to provide the vehicle tag number, but dispatch could not understand the number, due to radio interference. This was Green's final contact with OHP dispatch. After approximately ten minutes dispatch tried to contact Green with a welfare check ("10-90"), but got no response. After numerous unanswered welfare checks to Green's badge number (# 198) and an unanswered page, dispatch sent various units to Trooper Green's location and contacted the Cotton County Sheriff's Department.

¶ 4 The first person to arrive at the scene was Deputy Charles Thompson of the Cotton County Sheriff's Department.[5] He arrived at 7:15 a.m., wearing pajama bottoms, a t-shirt, and sandals. Trooper Green's patrol

car was parked on the right side of the road, with the driver's side door open and the headlights on. Thompson walked around the area until he discovered his friend's dead body, face down in the ditch, with his arms and legs spread, a few feet to the right and front of his patrol car.[6] It was obvious from the massive head wound to the back of his head that Green had been shot and that he was dead. Thompson immediately called his dispatch, and the investigation of Green's murder began.

¶ 5 What happened on Booher Road from the time of Green's arrival until his death can be largely pieced together from the physical evidence at the scene, statements made by Ricky Ray Malone, and the contents of a videotape recorded by the "Dashcam" video recorder mounted in Green's vehicle. According to statements made by Malone, Trooper Green arrived at the scene and attempted to rouse Malone by talking to him and shining a flashlight in his face. Officers who investigated testified that it was obvious from evidence left at the scene that someone had been manufacturing methamphetamine outside his or her car that night. It would have been obvious to Green as well.[7]

¶ 6 Green apparently informed Malone that he was under arrest and was able to get a handcuff on his right wrist, before Malone decided that he was not going to go quietly back to jail.[8] Malone somehow broke free and a battle ensued between the two men that tore up the grass and dirt in the area and knocked down a barbed wire fence. Malone's John Deere cap ended up in the barbed wire fence, and Green's baton and a Glock 9 mm pistol were left lying in the ditch.[9] The fight resulted in numerous scrapes, cuts, and bruises to both men.

4. Robles testified that the driver's side door was open and there were a lot of boxes and papers sitting around the car.

5. Thompson testified that he had known Nikky Green since they were in the third grade together.

6. Blood evidence presented at trial established that this was the position of Green's body at the time he was shot.

7. The area contained substantial evidence of recent methamphetamine production, and Malone

admitted at trial that he had been "cooking meth" the previous night.

8. Malone acknowledged at trial that he was out on a $50,000 bond at the time, on a pending charge of attempted manufacture of methamphetamine, as well as other related charges.

9. Malone's friend, Tyson Anthony, testified that the pistol left at the scene belonged to him, but that Malone had borrowed it the previous evening before he left to do the cook, saying he needed it "in case he got into trouble with the police."

¶7 Trooper Green's Dashcam recorder was switched on sometime during the course of this monumental struggle.[10] Because the Dashcam was directed forward, the video shows only the things that appeared immediately in front of Green's vehicle. The video never shows Trooper Green, but the audio on the videotape, though garbled and sometimes hard to understand, contains a poignant and heartbreaking record of the verbal exchanges between Malone and Green during the six minutes preceding Green's death.

¶8 The initial sounds on the audio are mostly grunting and unintelligible, as the men seemingly struggle for control. Then Malone appears to gain control and tells Green to lay there and not turn over. Green tells Malone that he didn't have a problem with Malone and that he came to help him. He tells Malone, "Hey, run if you want to go, but leave me." Green pleads, "Please! Please! I've got children." Green also tells Malone that he is married and begs Malone not to shoot him. Meanwhile, Malone repeatedly asks Green where "the keys" are, apparently referring to the keys for the handcuff that is on his wrist, and demands that Green stop moving and keep his hands up. Malone threatens to kill Green if he moves, but also promises that he won't shoot him if Green holds still. Malone searches at least one of Green's pockets, but fails to find the keys.[11] When Green suggests that he has another set of keys in his vehicle, Malone responds, "I don't need to know." Green apparently recognizes the significance of this statement and after a few seconds begins pleading again, "Please don't. For the name of Jesus Christ. He'll deliver. Lord Jesus!"[12] At that moment a shot can be heard, followed by eleven seconds of silence, and then another shot.[13]

¶9 Just after the second shot, Malone appears in the videotape, walking in front of Trooper Green's car and behind the open trunk of his white, four-door vehicle. Malone can be seen hurriedly "cleaning up" his makeshift methamphetamine lab—dumping containers of liquid that are sitting on the ground, loading numerous items into the back seat and trunk, throwing and kicking things off the road, and lowering the front hood.[14] Less than two minutes after shooting Green, Malone starts his car to drive away, but the car stalls. After almost thirty seconds, the car starts, and by 6:55 a.m. Malone has left the scene.

¶10 During the trial the State presented the testimony of Malone's four meth-making

10. Testimony at trial established that Dashcam recorders like Green's come on automatically when the overhead lights are activated and can also be turned on manually, either in the car or with a remote control. Trooper Green's Dashcam was switched on via his remote control at 6:45 a.m. that morning. The remote control had a remote microphone on it, which recorded the sounds at the scene from 6:45 a.m. until the recorder was turned off at 7:50 a.m. While it is possible that Green purposefully turned the recorder on, it is also possible that it got knocked on during the struggle. The remote control was found at the scene, not far from Green's right hand.

11. DNA evidence presented at trial established that a bloodstain on the inside of Green's left front pants pocket came from Malone.

12. The Dashcam videotape appears in the record as State's Exhibit 1. The record also contains a transcript of the audio of this videotape, which is in the record as Court's Exhibit 9. Although the transcript was not entered into evidence, text from the transcript was displayed on demonstrative exhibits used during the cross examination of Malone. (Neither the accuracy of the transcript nor the use of these demonstrative exhibits is challenged on appeal.) We have watched and listened to this videotape numerous times. This Court's interpretation of what was said differs slightly from the transcript in a few places, including within Green's final plea. The transcript records Green's final words as follows: "Please don't. In the name of Jesus Christ. Please remember, Lord Jesus." The summary in the text is based upon this Court's best interpretation of what was said. Any differences compared to the transcript are minor and do not affect overall meaning.

13. One 9 mm projectile, consistent with Green's own gun, was recovered from his head, and another was recovered from the ground beneath his head. The medical examiner testified that Green's death was caused by a massive head injury to the back of his head, caused by one or more gunshot wounds, at least one of which was likely a contact wound.

14. Malone left substantial drug evidence at the scene, including two "eight balls" of methamphetamine, which were left laying in the middle of the dirt road.

comrades: Tammy Sturdevant (Malone's sister), Tyson Anthony (her boyfriend), and J.C. and Jaime Rosser (who were married).[15] In December of 2003, these four people were living together in Sturdevant's trailer in Lawton and were jointly engaged, along with Malone, in a regular process of gathering and preparing the ingredients, making or "cooking" methamphetamine, and then using and distributing the methamphetamine. They all testified that they spent much of Christmas Day in 2003 preparing for a "cook" that night and that when Anthony got sick, Malone decided to go ahead. Malone left late that night, in Sturdevant's white Geo Spectrum, to complete the cook on his own.

¶ 11 Tyson Anthony testified that Malone appeared in his bedroom about 8:00 a.m. on the morning of December 26 and said that he had shot someone and needed Anthony to hide his sister's car.[16] Anthony hid the car behind a day care, about 100 yards from their trailer. Anthony testified that he saw Malone again around 5:00 p.m. that night, that Malone had already partially shaved his head, and that he asked Anthony to go get him some bleach to dye his hair, which Anthony did. Later that night Anthony went with Malone to a hotel in Norman, and Malone told him more about what had happened.[17] Malone showed him the gun he had used, which Malone said belonged to "the cop." [18] Anthony testified that Malone also referred to the officer as a "Hi–Po," meaning a highway patrolman. Anthony acknowledged that he himself put the gun in a hotel trash can and covered it up with trash.[19] Anthony left the hotel and went home, but later called Malone, who was still there, and suggested that he might be able to use the gun to frame someone else.[20]

¶ 12 J.C. Rosser testified that when Malone came home on the morning of December 26, 2003, he had a handcuff on his right wrist, bruising on his hands, and some blood on his shirt.[21] Malone told Rosser that he had "killed a cop." Malone asked Rosser to give him a ride to his home in Duncan, which Rosser agreed to do. Rosser testified that he and his wife got in the car and that Malone came out wearing different clothes and carrying a white plastic garbage bag. They stopped at Sturdevant's car, and Malone retrieved a big black case from it. They also stopped at a wooded area on Camel Back Road, where Malone got out and dis-

---

**15.** All four of these witnesses spent time in jail on material witness warrants in this case.

**16.** Anthony was in jail on a material witness warrant until after his preliminary hearing testimony, when his bond was reduced. He acknowledged at trial that he agreed to testify in exchange for the district attorney's agreement not to charge him as an accessory after the fact or on any prior drug-related offenses. At the time of Malone's trial, Anthony was back in jail, charged with a new count of aggravated manufacture of methamphetamine.

**17.** At trial Anthony recounted that Malone told him the following. Malone was asleep and woke up to a gun and a flashlight in his face. The cop told him to get out, and Malone tried to run but tripped and fell. The cop got on his back and got a handcuff on him, but then they were rolling around and fighting, until Malone saw a gun on the ground and was able to get it. The cop prayed, said he had kids, and begged Malone not to shoot him or kill him, but Malone said, "You would have done it to me," and shot him twice in the back of the head. (The audio of the videotape does not contain anything similar to the quoted statement, though the other statements attributed to Malone by Anthony are consistent with the videotape.)

**18.** Malone told Anthony that he lost the gun he had borrowed from Anthony and that he thought he dropped it at the scene of the shooting.

**19.** The murder weapon was never found. Malone testified at trial that Anthony got rid of it.

**20.** During cross examination Anthony testified that at the time of the shooting, he, Sturdevant, the Rossers, and Malone were all "heavy into the use of methamphetamine" and that they were high "constantly," from December 20 until December 26, 2003.

**21.** J.C. Rosser testified that he was in jail in Stephens County on various methamphetamine-related charges when he first spoke with officers about Malone. Rosser's charges stemmed from a November 2003 raid on his home, which resulted in the Rossers moving in with Sturdevant. Rosser agreed to testify in Malone's case in exchange for having these prior charges dropped and not being charged as an accessory after the fact in Green's murder. Rosser was released on bond after his preliminary hearing testimony in Malone's case.

posed of the white bag.[22] J.C. Rosser testified that on the way to Duncan, Malone told the Rossers that he had killed a state trooper and that he "was real sorry."[23] Rosser testified that he dropped Malone off on the back side of his Duncan home and that he and Jaime went in through the front. They waited in the garage while Malone got the big black case and a gun out of the car and then waited while Malone got his own handcuff key. Malone showed them a "black Glock," saying it was the one he'd used to kill the trooper. Rosser testified that the gun had blood and grass and hair on it. Malone also told Rosser that he "fucked up" and was "sorry."[24]

¶ 13 Jaime Rosser testified that her husband woke her around 8:30 a.m., on December 26, 2003, and insisted she go with him to Duncan.[25] She waited in the car with her husband until Malone came out with a white garbage bag and got in the back seat. Rosser testified that on the way to Duncan, Malone stated, "I killed him. I killed him. I killed a cop." When she turned to look at him, she saw that he had a handcuff on his right wrist. Rosser testified that Malone said he had shot "a Hi–Po" two times in the head and that on the first shot, "the bone part of the skull stuck to the gun, and so [I] shot it again to get the gun clean."[26] Jaime Rosser testified consistently with her husband regarding Malone disposing of the white bag and their time in his home that morning.[27] She also testified that when she saw Malone back at the trailer that night, he could tell she was upset and told her, "Don't think of it as me killing him; think of him as an animal and I was hunting." Malone also told her that he had gotten everything "cleaned up" and that "there shouldn't be anything left out there to identify [me]." When Rosser asked him, "What about the tape?" referring to the patrol car videotapes often seen on TV, Malone responded, "Oh, fuck."[28]

¶ 14 Tammy Sturdevant, Malone's sister, also testified.[29] She recalled that Malone

22. With J.C. Rosser's assistance, the white garbage bag was later recovered. Its contents, *i.e.,* Malone's clothing from the morning of the shooting, were entered into evidence at trial.

23. J.C. Rosser described Malone's account of what had happened as follows. Malone had been sleeping and was awakened by the officer with a gun and a flashlight. The officer had Malone on the ground, with a knee in his back, when Malone said, "Fuck this," and started fighting and struggling. According to Malone, the officer was hitting him on the head with his baton, and Malone said, "I like it; give me some more." The officer begged for his life, but Malone said, "You would have did it if you were in my shoes. You'd have did the same." Malone then "shot him once and then he shot him again just to make sure," *i.e.,* to "make sure he was dead."

24. Rosser testified that in late December of 2003, he, his wife, Anthony, Sturdevant, and Malone were high on methamphetamine together "almost all the time."

25. Jaime Rosser testified that she (like her husband) was in Stephens County Jail (on drug charges stemming from the November raid on their home) when she was first approached about Green's murder, in late December of 2003. Although her husband negotiated the agreement, she got basically the same deal. She was released and her drug charges were dropped after she testified at Malone's preliminary hearing. She acknowledged on cross examination that she could have gotten as much as a life sentence on the attempted manufacturing charge she faced in the other case and that she was guilty of that charge.

26. Jaime Rosser testified that Malone said he fell asleep during the cook, and the officer came up and tapped him on the shoulder. They rumbled around and fought, and the officer got one handcuff on him. She remembered that Malone said that the officer had begged for his life and that Malone responded, "If you were in my shoes, you would do the same thing." Rosser did not remember Malone talking about the officer praying or referring to his family.

27. She described waiting in the garage while Malone left to get a handcuff key and then came back and took off the handcuff. Rosser testified to being upset by the sight of the gun, which she described as "nasty," because it "was gooey and it had blood and hair on it."

28. A clip from Green's Dashcam video, showing Malone in front of Green's car, was shown on local television stations that same night. Officer Keith Stewart, a Duncan police officer who was familiar with Malone, recognized Malone in the video and immediately reported this information.

29. Sturdevant acknowledged at trial that she had lied in all of her initial contacts with law enforcement officers, in an attempt to help her brother. She also admitted that although she had agreed

borrowed Anthony's black handgun before leaving to do the cook on Christmas Night, "just in case there was trouble." She next saw her brother at around 8:00 a.m. the next morning, when he came into her bedroom and said, "I need your help. I need you to call your car in stolen. I—I shot a trooper." Malone then told her and Anthony the details of what had happened.[30] Sturdevant testified that Malone had a handcuff hanging from his right wrist, which was bruised and swollen, and his hands were cut. Sturdevant acknowledged that she got Malone the white trash bag for his clothes, and later that day she dyed his hair blond and cut it.[31] Sturdevant testified that she, her brother, and all of the occupants of her trailer were heavily into methamphetamine in December of 2003, that methamphetamine distribution was their sole source of income, and that they were all "high all the time," from December 20, 2003, until the morning of the shooting.[32]

¶ 15 By December 29, 2003, investigators had found the car driven by Malone, recovered his clothes on Camel Back Road, and obtained significant information from J.C. Rosser and Tyson Anthony about Malone's involvement in the killing of Trooper Green.[33] In an interview on this date, Malone acknowledged that what Anthony had told investigators—that Malone had killed the trooper, that he shouldn't have done so, and how it happened—was "true" or "probably true."[34] When pressed to take responsibility himself, Malone responded, "I can't—I can't say. If I say anything, I'm going to get the death penalty." Later in the interview Malone stated, "Well, maybe it was an accident."

¶ 16 Malone testified at trial. He provided a history of his involvement with drugs, legal and illegal, beginning with steroids to get bigger when he was a firefighter, including Prozac to combat depression when his marriage was in trouble, and then Lortabs, which began with a football injury but developed into an addiction. Malone testified that he began using methamphetamine in April of 2002, around the time his mother died. He described the effects of the drug and how his usage of methamphetamine, like his usage of pain pills, increased over time.[35] He acknowledged that by October of 2003, his methamphetamine addiction had caused him to be fired from his jobs at the fire department and as an EMT with an ambulance service, and that all of his income was coming from making and selling methamphetamine. Malone claimed that he didn't sleep from December 4 through December 26, 2003, due to being continuously "amped up on meth,"

to testify truthfully at Malone's preliminary hearing, she had not done so, because she was still trying to help her brother. Consequently, she remained in jail from the time of Malone's June 2004 preliminary hearing until the time of his May 2005 trial. Sturdevant also testified that she was telling the "absolute truth" at trial and that she expected to be released after the trial ended.

30. Sturdevant described Malone's account of what happened as follows. Malone woke up to a flashlight in his eyes, and an officer made him get out of the car. Malone was on his stomach, with one arm behind his back, and the officer got one cuff on him, but somehow Malone got up. Malone tried to run, but tripped, and was hit on the head a few times, and he and the officer got into a "scuffle" and went into some barbed wire. Malone saw a gun on the ground and picked it up. The officer begged for his life, saying "Jesus Christ, no." Malone also recounted that he said to the officer, "If I wouldn't have done it to you first, you'd have done it to me."

31. Sturdevant also reported her car "stolen" to the Lawton Police Department.

32. Sturdevant also acknowledged that she introduced her brother to methamphetamine.

33. DNA evidence presented at trial established that Green's blood was found on the driver's seat of the car driven by Malone, on a black container inside the car, and on various items of Malone's clothing recovered on Camel Back Road.

34. When Malone was first interviewed, on December 27, he denied any involvement and claimed he was home with his wife on the night of the shooting. Nevertheless, investigators noted marks on his right wrist consistent with a handcuff and that Malone seemed very stiff, as if he was sore.

35. Malone described how methamphetamine made him moody and paranoid and that he sometimes heard voices and thought he saw things that weren't there—like when he would "hear" people in his attic and when he "saw Bigfoot" while he was out cooking at the lake.

and that he was hearing voices and seeing things during this time.[36]

¶ 17 Regarding the night of December 25, 2003, Malone described hearing voices and seeing "people jumping ... around" as he was stealing and transporting the anhydrous ammonia needed for the cook. He testified that while in the middle of the cook, his back started hurting, so he took some Lortabs and then passed out. He described waking up to a gun and a flashlight in his face and testified that he thought he was about to get robbed or killed. Malone repeatedly denied that he knew Green was connected with law enforcement, until after he had killed him.[37] He described finding a gun and the other man begging him not to shoot. Malone testified that the other man kept trying to get up and that the "voices in my head" told him to shoot him, because the man was "going to get me." So he shot him.[38]

¶ 18 Dr. David Smith, a California physician specializing in addiction medicine, testified as an expert witness on Malone's behalf. He provided extensive testimony on his own expertise, particularly regarding methamphetamine, on genetic predisposition to addiction and depression, and on the science of how methamphetamine affects the brain. In particular, Smith explained how when someone is extremely "intoxicated" on methamphetamine, to the point of "amphetamine psychosis," the effect on the person is comparable to paranoid schizophrenia. He explained that like paranoid schizophrenia, amphetamine psychosis can include auditory and visual hallucinations, where an individual will respond to non-existent environmental stimuli or threats.[39] Dr. Smith also described less severe, but still serious methamphetamine effects, including a "rage reaction," where the individual responds to an actual threat, but overreacts.

¶ 19 Dr. Smith testified that he had met with Malone the previous day (a Sunday) and reviewed various materials associated with the case, including the Dashcam video. Smith testified about the substantial history of addiction and depression in Malone's family and the history and extent of Malone's drug abuse, including how much he was using and its effect on his life at the time of the shooting.[40] Smith described the time Malone was convinced he had seen Big Foot, whom Malone thought was after him, which Smith indicated was an example of someone experiencing amphetamine psychosis. He also recounted that Malone was smoking methamphetamine "every hour" and was "hearing voices" and "seeing things" on the night before and morning of his encounter with Green.[41] Dr. Smith concluded that Malone was most likely in a state of "amphetamine psychosis" on the morning of the shooting, making him likely to engage in "crazy, irrational violence." He further testified that he did not think Malone could have formed the intent to commit first-degree murder.[42]

36. Malone acknowledged on cross examination that he was stopped on December 15, 2003, and given a verbal warning for having loaded and concealed weapons in his car. He was stopped again on December 22, 2003, and this time he was charged with attempted manufacturing, possession of precursor ephedrine, and possession of three loaded and accessible firearms.

37. Malone testified that he was "fighting for his life" and that he kept "trying to get away from this dude." Malone claimed that he didn't know the person he was fighting was law enforcement until he saw the highway patrol sticker on the man's open car door, after Green was already dead. Malone also testified that it was "too dark" to see that the other man was in uniform and had a badge and that he would have submitted if he'd realized that Green was a highway patrol trooper.

38. Malone testified on cross examination that he did not notice the handcuff on his wrist until he was back in his car. He couldn't explain what "keys" he kept asking for on the Dashcam video.

39. Dr. Smith testified that users sometimes refer to this hallucinatory effect as "tweaking."

40. Dr. Smith testified that Malone told him that in late December of 2003, he was hardly sleeping and "was using 4 to 5 grams of methamphetamine, smoking it, and using 20 to 40 Lortab."

41. Dr. Smith testified, "He thinks he's being attacked by all these people, and then this unfortunate altercation occurs." Dr. Smith also recounted Malone's perception "[t]hat he was under attack and that the dead body was coming after him."

42. The State's impeachment of both Malone and Dr. Smith is discussed within Proposition I.

## ANALYSIS

¶ 20 In Proposition I, Malone argues that errors in the jury instructions regarding his voluntary intoxication defense violated his right to a fair trial. Initially, the State responds that the evidence presented by Malone was inadequate to even require instructions on voluntary intoxication; hence any error in the instructions given could not have harmed him.

¶ 21 We rejected a parallel claim made by the State just last year in *Coddington v. State*.[43] In *Coddington*, we held that expert opinion testimony that is otherwise admissible is not objectionable simply because it embraces an "ultimate issue" to be decided by the trier of fact.[44] In particular, we held that an expert on the effects of illegal drugs or other intoxicating substances could properly offer an opinion on whether a defendant was so affected by the use of such substances that he or she was unable to form the specific intent required for first-degree malice murder, *i.e.*, "malice aforethought," defined as a deliberate intent to kill.[45] In *Coddington*, this Court rejected the State's argument that the defendant's jury should not have been instructed on the defense of voluntary intoxication.[46] We do so again here.

¶ 22 Malone, like Coddington, raised sufficient evidence to require the trial court to instruct the jury on his defense of voluntary intoxication.[47] The test for evaluating whether sufficient evidence has been introduced to instruct the jury on the defense of voluntary intoxication is the same as the test used regarding other affirmative defenses. Voluntary intoxication instructions should be given when evidence has been introduced at trial that is adequate to raise that defense, *i.e.*, to establish a prima facie case of voluntary intoxication, as that defense is defined under our law.[48] As we have

43. 2006 OK CR 34, 142 P.3d 437.

44. *Id.* at ¶ 41, 142 P.3d at 449 (citing 12 O.S. 2001, § 2704). We noted that expert testimony that merely tells a jury what result to reach remains inadmissible and also that expert testimony is improper regarding issues that lay jurors are qualified to evaluate based upon the experiences of everyday life. *Id.* (citations omitted). The key issue remains whether the proposed expert testimony would likely "assist the trier of fact." *Id.*

45. *Id.* at ¶ 42, 142 P.3d at 449. At Malone's trial Dr. Smith was allowed to give his expert opinion that due to Malone's use of methamphetamine and Lortabs, he could not have formed a deliberate intent to kill at the time he shot Trooper Green.

46. *See id.* at ¶¶ 43–44, 142 P.3d at 450 ("Coddington raised sufficient evidence for the trial court to instruct the jury on his defense of voluntary intoxication.... We disagree with the State's position that Coddington's jury was 'erroneously instructed' on the defense of voluntary intoxication.").

47. *See id.* at ¶ 43, 142 P.3d at 450.

48. *See Jackson v. State*, 1998 OK CR 39, ¶ 65, 964 P.2d 875, 892 (per curiam) ("The test used should be no different from the test used on any other defense. When sufficient, *prima facia* [sic] evidence is presented which meets the legal criteria for the defense of voluntary intoxication, or any other defense, an instruction should be given.") In Jackson, four of the five voting judges on this Court agreed that this was the appropriate test for evaluating whether voluntary intoxication instructions should be given. *See id.* (two judges concurring in the opinion) *and* 964 P.2d at 902 (Lane, J., dissenting, joined by Strubhar, J.) ("I applaud and concur with the majority's clarification of the test to be used in determining whether an instruction on defendant's theory of defense should be given.").

The State invokes *Taylor v. State*, 2000 OK CR 6, ¶ 20, 998 P.2d 1225, 1230, in which this Court found that "an instruction on voluntary intoxication was not warranted by the evidence and it was error for the trial court to so instruct." Although evidence of drug and alcohol use was admitted in *Taylor*, the evidence presented at that trial was inadequate to establish a prima facie case that the defendant was intoxicated at the time of the crime, to the extent that he was unable to form a deliberate intent to kill. *Id.* at ¶¶ 18–20, 998 P.2d at 1230. We note that the test cited in *Taylor*, *i.e.*, that in order to rely upon voluntary intoxication as a defense, "the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite intent," *id.* at ¶ 19, 998 P.2d at 1230 (citing *Crawford v. State*, 1992 OK CR 62, ¶ 53, 840 P.2d 627, 638), which is recited just after citing *Jackson, see id.*, is the very test that was explicitly rejected in *Jackson*. *See Jackson*, 1998 OK CR 39, ¶¶ 63–65, 964 P.2d at 891–92. We find that the test cited in *Taylor* and *Crawford* for determining whether to instruct the jury on the voluntary intoxication defense—by evaluating whether the defendant's evidence is sufficient to "raise a reasonable doubt" about his ability to form the requisite intent—is an incorrect statement of the legal standard to be applied in this

emphasized in the past and in regard to other affirmative defenses, "[t]he evidence of the defense may come from any source and should not be weighed by the trial court. The trial court should leave the weighing of the evidence to the finders of fact, in whose judgment our system of trial by jury is based." [49]

¶ 23 We find that the evidence presented at Malone's trial adequately raised the defense of voluntary intoxication. Hence the trial court properly determined that his jury should be instructed on this defense. The evidence presented at Malone's trial—in particular, Malone's own testimony about his drug use and the effects it was having on him at the time of the shooting, as well as the testimony of Dr. Smith that Malone could not have formed the intent of malice aforethought—when looked at simply to determine if, *on its face*, it established a prima case of intoxication, certainly was sufficient to raise a voluntary intoxication defense, such that Malone was entitled to have his jury instructed on this defense.

¶ 24 The State acknowledges that the voluntary intoxication instructions provided to Malone's jury were legally incorrect. The State maintains, however, that the errors in the instructions were harmless beyond a reasonable doubt. We consider the instructions given at Malone's trial as a whole. We begin by noting that defense counsel did not raise an objection to the jury instructions given at Malone's trial.[50] Hence we review these instructions for plain error.[51]

¶ 25 Malone's jury was correctly informed that evidence had been introduced in support of intoxication as a defense to the charge of first-degree murder.[52] The next instruction, however, which purported to give the requirements for establishing an intoxication defense, was wrong. Malone's Instruction No. 38 stated as follows:

> The crime of murder in the first degree has an element the specific criminal intent of Mens Rea. A person in entitled to the defense of intoxication if that person was incapable of forming the specific criminal intent because of his intoxication.

The State concedes that this instruction "erroneously omits 'malice aforethought' as the element of first degree murder to which the voluntary intoxication defense applies."

¶ 26 The applicable uniform instruction in effect at the time, OUIJI–CR (2d) 8–36, stated as follows:

> The crime of [**Crime Charged in Information/Indictment**] has an element the (**specific criminal intent of [Specify Specific Mens Rea]** )/**special mental element of [Specify Special Mental State]** ). A person in entitled to the defense of intoxication if that person was incapable of forming the (**specific criminal intent**)/(**special mental element of the crime**) because of **his/her** intoxication.

Hence it is important to evaluate the instruction given in Malone's case in the context of the uniform instruction in place at the time, which itself had two obvious "typos"/grammatical errors.[53]

---

context. The proper legal standard to be applied in this context is the prima facie evidence standard used in this opinion.

49. *Jackson*, 1998 OK CR 39, ¶ 66, 964 P.2d at 892.

50. Just before closing arguments in the first stage of Malone's trial, the district court held a very brief conference on jury instructions. The court indicated that it had prepared the instructions, along with a verdict form. Counsel for both the State and Malone confirmed that they had examined the instructions, and both the State and defense counsel indicated that they had no objections to the proposed instructions and did not request any further instructions. The trial court also asked Malone if his attorneys had spoken with him about the instructions. Malone confirmed that he had a general awareness of the instructions and was satisfied with them.

51. *See, e.g., Norton v. State*, 2002 OK CR 10, ¶ 17, 43 P.3d 404, 409.

52. Malone's Instruction No. 37 accurately tracks OUJI–CR(2d) 8–35, which introduces the voluntary intoxication defense, and which has not changed since the adoption of the Second Edition to Oklahoma's Uniform Criminal Jury Instructions in 1996. We note that Malone's Instruction No. 37, following the language of OUJI–CR(2d) 8–35, does not distinguish between voluntary and involuntary intoxication.

53. From the time of its adoption in 1996 until the 2005 Supplement, which took effect on July

¶ 27 We begin by noting that although this Court has repeatedly announced that district courts are required to use the applicable uniform instructions, unless the trial court determines that those instructions do not accurately state the law,[54] where it is *obvious* that a uniform instruction contains a typographical error, grammatical error, or other similar mistake, the district court should correct the error in the instruction provided to the jury.[55]

¶ 28 In the current case this Court is not troubled by the missing "as" in the first sentence or the word "in" in the second sentence of Malone's Instruction No. 38. We are confident that his jury was not confused or misled by these small errors, which followed the applicable uniform instruction. The use of the word "Mens Rea" in the first sentence, however, is a much more significant error. This word should *not* have appeared in the instructions provided to Malone's jury, nor should it appear in any version of OUJI–CR 8–36 that is provided to a jury.

¶ 29 Rather, it was the duty of the trial court to use the template of OUJI–CR 8–36 to formulate the appropriate instruction in Malone's case, by filling in the specific criminal intent at issue, namely, "malice afore-

thought," in place of the bracketed phrase "Specify Specific Mens Rea."[56] And it was the duty of the parties, both defense counsel and the State, to assist in ensuring that this was done appropriately.

¶ 30 The following would have been a proper and legally accurate version of Instruction No. 38 in Malone's trial:

The crime of murder in the first degree has as an element the specific criminal intent of malice aforethought. A person is entitled to the defense of voluntary intoxication if that person was incapable of forming this specific criminal intent because of his intoxication.[57]

Since "malice aforethought" is defined by our law as a deliberate intent to kill, it would also have been acceptable for the first sentence to read: "The crime of murder in the first degree has as an element the specific criminal intent of a deliberate intent to kill."[58] As the State acknowledges, however, instructing Malone's jury that "The crime of murder in the first degree has an element the specific criminal intent of Mens Rea" was incorrect, confusing, and legally nonsensical. This is a serious error, and it is not corrected or mitigated by the other intoxication instructions

---

28, 2005, OUJI–CR(2d) 8–36 has been missing the word "as" after the initial "has," uses the word "in" for what should obviously be an "is" in the second sentence, and has contained references to the potentially confusing term "special mental element." The 2005 Supplement added the missing "as" and deleted the references to "special mental element," but failed to change the "in" to "is," apparently because the drafters mistakenly believed it already said "is." (The "marked-up" version of the new 8–36, attached to this Court's Order Adopting the 2005 Revisions to OUJI–CR(2d), has an "is" rather than an "in" in the second sentence). Hence the current version of 8–36 states:

> The crime of **[Crime Charged in Information/Indictment]** has as an element the specific criminal intent of **[Specify Specific Mens Rea]**. A person in entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of **his/her** intoxication.

OUJI–CR(2d), Supp.2005, 8–36.

54. *See, e.g., Flores v. State*, 1995 OK CR 9, ¶ 5, 896 P.2d 558, 560 (citing *Fontenot v. State*, 1994 OK CR 42, ¶ 55, 881 P.2d 69, 84).

55. It would aid this Court's review if district courts would note in the record that they are making such a correction, either by explaining the change in a transcribed hearing or by an "as corrected" designation on the actual paper instruction provided to the jury.

56. *See, e.g., Hogan v. State*, 2006 OK CR 19, ¶ 39, 139 P.3d 907, 923 ("It is settled law that trial courts have a duty to instruct the jury on the salient features of the law raised by the evidence with or without a request.") (citations omitted), *cert. denied*, —— U.S. ——, 127 S.Ct. 994, 166 L.Ed.2d 751 (2007).

57. In this version this Court has added the missing "as" in the first sentence and replaced the "in" with an "is" in the second sentence; we have also substituted the word "this" for the word "the" before the phrase "specific criminal intent," to more clearly inform the jury that "malice aforethought" is one kind of "specific criminal intent."

58. *See, e.g.,* OUJI–CR(2d) 4–62 (defining and explaining "malice aforethought").

provided at Malone's trial.[59]

¶ 31 In fact, some of the other intoxication instructions may have further confused Malone's jury regarding what exactly the specific mental state was that had to be overcome by intoxication, in order for Malone to prevail on his voluntary intoxication defense. Malone's Instruction No. 39 accurately tracked OUJI–CR(2d) 8–37 and informed his jury that the intoxication defense could be established "by proof of intoxication caused by drugs." [60] Malone's Instruction No. 40 likewise tracked OUJI–CR(2d) 8–38, regarding the State's burden to prove beyond a reasonable doubt that Malone possessed the specific intent at issue and was not prevented by intoxication from forming this intent.[61] Unfortunately, this instruction did *not* inform Malone's jury what specific mental state was at issue, referring again to the general phrase "specific criminal intent," rather than the particular mental state at issue in this case.

¶ 32 Finally, Malone's Instruction No. 41, the last intoxication instruction, stated as follows:

"Drugs" are defined as substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in a human or other animal; substances other than food intended to affect the structure or any function of the body of a human or other animal; under the law, the substance methamphetamine is a drug.

"Incapable of Forming Special Mental Element" is defined as the state in which one's mental powers have been overcome through intoxication, rendering it impossible to form the special state of mind known as willfully.

"Incapable of Forming Specific Criminal Intent" is defined as the state in which one's mental powers have been overcome through intoxication, rendering it impossible to form a criminal intent.

"Intoxication" is defined as a state in which a person is so far under the influence of an intoxicating drug that his judgment is impaired.

This instruction tracked OUJI–CR(2d) 8–39 as it existed at the time.[62] Yet, once again, it was not properly tailored to Malone's case.[63]

---

59. Malone's jury was correctly instructed regarding the elements of first-degree murder, including "malice aforethought," which is also correctly defined. These separate instructions, however, make no reference to the legalistic phrase "specific criminal intent," which is used repeatedly in the intoxication instructions. Hence even a jury that sought diligently to apply its instructions "as a whole" could have been left uncertain regarding the meaning of "specific criminal intent" and what that particular intent was supposed to be in Malone's case.

60. *See* OUJI–CR(2d) 8–37 ("The defense of intoxication can be established by proof of intoxication caused by **narcotics/drugs/(hallucinogenic substances)**"). This instruction has not been modified since the adoption of the second edition in 1996.

61. Malone's Instruction No. 40 stated as follows: It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of the crime of murder in the first degree. If you find that the State has failed to sustain that burden, by reason of the intoxication of Ricky Ray Malone[,] then Ricky Ray Malone must be found not guilty of murder in the first degree. You may find Ricky Ray Malone guilty of murder in the second degree if the State has proved beyond a reasonable doubt each element of the crime of murder in the second degree.

Except for the two missing commas (noted by brackets), this instruction accurately tracks OUJI–CR(2d) Supp.1997, 8–38, which was in effect at the time. This instruction was modified in 2005 to delete a potential reference to the term "special mental element" in the first sentence, which was not used in Malone's case anyway. *See* OUJI–CR(2d) Supp.2005, 8–38.

62. OUJI–CR(2d) 8–39 was not modified from the time of its adoption in 1996 until 2005. Prior to the 2005 Supplement, OUJI–CR(2d) 8–39 provided four possibilities for defining the "special mental element" term: "corruptly/knowingly/willfully/maliciously." In 2005, the "incapable of forming special mental element" definition was eliminated, and the definition of "intoxication" was modified as follows (eliminating crossed out terms and adding the underlined terms) to "[a] state in which a person is ~~so far~~ under the influence of an intoxicating ~~liquor/drug/substance~~ to such an extent that ~~his/her (passions are visibly excited)/(judgment is impaired)~~". OUJI–CR(2d), Supp.2005, 8–39.

63. The record contains no explanation of why the "incapable of forming special mental element" definition was included in Malone's instructions, since this term was not otherwise used in the instructions; nor does the record reveal why the "special state of mind" referenced in that definition is "willfully." The record re-

¶ 33 Malone's counsel. correctly notes that (following the version of 8–38 in effect at the time) the definition of "incapable of forming specific criminal intent" refers to intoxication that overcomes a person's mental powers and renders it impossible "to form a criminal intent." This definition is unhelpful at best and confusing/misleading at worst.[64] This Court directs that the Oklahoma Uniform Jury Instruction Committee review the current voluntary intoxication instructions and propose amendments in accord with this opinion.[65]

¶ 34 This Court does not hereby conclude that Oklahoma's uniform instructions for the voluntary intoxication defense are or were legally inaccurate, inadequate, or unconstitutional. When properly utilized, OUJI–CR(2d) 8–36 did and still does specifically inform a jury what particular criminal intent/mens rea is at stake. Hence it is legally accurate and adequate and provides due notice regarding the defendant's defense. We simply recognize that the instructions could be and should be improved, and we direct that this be done.

¶ 35 Most jurors come to their assigned task with a basic understanding of what their job will be, but individual perceptions may be confused or flawed regarding many of the specifics of jury service and the jury's role.

And very few jurors are versed in the particular elements of the various crimes and defenses they may be asked to evaluate. Hence jury instructions serve a fundamental and critical role in our system of trial by jury. Jury instructions serve as the jury's job description, rule book, and mission statement. The key "institutional actors" in our criminal system—trial courts, prosecutors, defense counsel, and this Court—should all do everything reasonably possible to make the contents of these juror guidebooks as clear, readable, and legally accurate as they can possibly be. And this Court appreciates and acknowledges the work of the Oklahoma Court of Criminal Appeals Committee for Preparation of Uniform Jury Instructions for its consistent and committed efforts in assisting this Court in this regard.

■ ¶ 36 This leaves us with the problem in the current case that Malone's jury instructions did. not, by themselves, adequately or accurately inform his jury that he should prevail on his intoxication defense if he could establish that due to methamphetamine intoxication at the time of the crime, he was unable to form the required "malice aforethought" for first-degree murder, i.e., if the evidence established he was unable to form a deliberate intent to kill Trooper Green.[66]

veals only that it was the trial court who prepared the instructions and that the parties did not object. Malone makes much of the improper inclusion of this definition in his instructions, particularly the reference to "willfully." This Court finds, however, that this error was not significant. The phrase "special mental element" was not otherwise used in Malone's instructions; thus a reasonable jury reading · its instructions as a whole, as it was directed to do, would have no occasion to apply this definition in Malone's case. Cf. Norton v. State, 2002 OK CR 10, ¶ 18, 43 P.3d 404, 409 (concluding that "superfluous definition" of term that "was not enumerated as an element of the offense" was "harmless").

64. The definition should reference intoxication that overcomes a person's ability to form the "specific criminal intent" at issue, which would be best done by actually *naming* that intent, i.e., in this case, either "malice aforethought" or "a deliberate intent to kill." Of the current five uniform instructions on this defense, only one— OUJI-CR(2d) 8–36—informs the jury what "specific criminal intent" is actually at issue, by directing the trial court to "[Specify [the] Specific Mens Rea]." Phrases like "mens rea" and "spe-

cific criminal intent," when not defined in plain language, are unhelpful and may be incomprehensible to lay jurors.

65. This Court recognizes that the 2005 Supplement to the voluntary intoxication instructions cleared up some of the typos and potentially confusing aspects of these instructions, in particular, the "special mental element" references. Yet the instructions remain in need of further improvement. (For example, although the 2005 Supplement added the clarifying word "voluntary" to the phrase "defense of [voluntary] intoxication" in OUJI–CR(2d) 8–36, the voluntary intoxication instructions otherwise refer simply to an "intoxication defense." It would be clearer to consistently refer to the "voluntary intoxication defense," particularly in cases that might also involve an involuntary intoxication defense.)

66. This Court notes that Malone's Instruction No. 14, following OUJI–CR(2d) 4–63, informed his jury that "all [] circumstances connected with a homicidal act" "may be considered" in the determination of "whether or not deliberate intent existed in the mind of the defendant to take a human life." This instruction, though

This Court concludes that the failure of Malone's jury instructions to accurately instruct his jury in this regard constitutes plain error. This was the critical question in determining whether Malone could prevail on his voluntary intoxication defense, and his jury instructions, even read as a whole, fail to adequately articulate this standard.[67]

■ ¶ 37 Hence this Court must evaluate the effect of this instructional error and determine whether or not it was harmless beyond a reasonable doubt.[68] We recognize that such an infirmity can and often will require reversal, particularly where the defendant has requested the instructions and adequately raised the defense at issue. Nevertheless, upon a thorough review of the entire record in this case, this Court is convinced that despite the inadequacy of the jury instructions, no juror could possibly have been unaware that Malone's defense was voluntary intoxication and that he should prevail on this defense if he could establish

that due to his drug-induced intoxication, he did not deliberately intend to kill Green. A review of the transcripts in this case makes readily apparent that Malone's fundamental defense—from opening statements to closing arguments of the first stage of his trial—was that his methamphetamine use, coupled with his use of Lortab, left him so intoxicated that he was unable to and did not intend to kill Trooper Green.[69] More importantly, this Court is convinced that there was no reasonable possibility that Malone's jury would have agreed with and accepted his voluntary intoxication defense, regardless of how thoroughly the jury was instructed upon it.

¶ 38 The real problem for Malone was not his jury instructions. The problem was that no reasonable juror who heard all the evidence in the first stage of his trial could possibly have concluded that he was unable to form "malice aforethought" at the time of the shooting or that he did not deliberately intend to kill Trooper Green.[70] The evidence

general, allowed Malone's jury to consider the potential impact of his alleged intoxication on the "deliberate intent" element of first-degree murder. *Cf. Fontenot v. State*, 1994 OK CR 42, ¶ 52 n. 20, 881 P.2d 69, 84 n. 20 (noting that this instruction allowed the jury to consider "all circumstances surrounding the homicidal act in determining whether [defendant] had the requisite intent to kill"). Yet this general instruction failed to require Malone's jury to consider the impact of his alleged intoxication in this way.

67. This Court recognizes that the jury's verdict, finding Malone guilty of first-degree murder, necessarily implies that his jury did, in fact, conclude that he deliberately intended to kill Trooper Green. Nevertheless, Malone's jury should have been correctly instructed regarding how his intoxication defense related to the first-degree murder charge against him.

68. The United States Supreme Court has confirmed that harmless error analysis is appropriate even in cases where jury instructions omit a required element for a crime upon which the defendant was convicted. *See Neder v. United States*, 527 U.S. 1, 4, 119 S.Ct. 1827, 1831, 144 L.Ed.2d 35 (holding that "harmless-error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)," applies to failure to submit required element of "materiality" to jury); *see also id.* at 15, 119 S.Ct. at 1837 ("[T]he omission of an element is an error that is subject to harmless-error analysis …"). If harmless error analysis applies even when an element of a criminal offense has been omitted, it is certainly appropriate here.

69. Malone's attorney noted early in her opening statement that the case would be about "methamphetamine … what it does to a person, how it affects a person's life, and how it can ruin lives—not only of the person taking it, but of others." Defense counsel concluded her opening statement by telling the jury that Dr. Smith would tell them "that a person who is using methamphetamine as much as these people were using, and particularly Mr. Malone, cannot form the intent to do anything. They cannot form the intent to commit a crime." In her first-stage closing argument, defense counsel argued that Malone "was a paranoid schizophrenic when he was on that road and he was awakened by Nik Green. He could not form the intent." And she concluded her closing argument as follows:

We would submit to you that Mr. Malone was so intoxicated on methamphetamine and Lortab that he did not and could not have physically formed the thought, whether that be a second before, an hour before, or a day before, to kill Trooper Nik Green. He did not have the ability to do that because he was smoking meth every hour on the hour, and taking 40–some Lortab a day. He could not do that. And we would request that you find in our favor.

70. In *Neder*, the Supreme Court concluded that the failure to submit the issue of "materiality" to the jury in that case was "harmless beyond a reasonable doubt," because "no jury could reasonably find that Neder's failure to report substantial amounts of income on his tax returns was not 'a material matter.'" *Id.* at 16, 119

in this case, though not uncontested, was overwhelming and clearly established that Malone knew what he was doing and deliberately chose to shoot and kill Green.[71]

¶ 39 Malone's testimony about what happened and his lack of comprehension at the time of the shooting was thoroughly impeached by the State, mainly by going through the audio contents of the Dashcam video, in addition to the physical evidence at the crime scene.[72] The prosecutor focused particularly on the theme that Malone's words and actions, both during his encounter with Green and in the days afterward, were logical and goal-oriented and did not suggest that Malone was experiencing any sort of disconnect from reality. The prosecutor cross examined Malone about the fact that he never mentioned anything to his friends about seeing things or hearing "voices" on the morning of the shooting.[73] Malone acknowledged on cross examination that he was "solely responsible for this trooper's death," and that he shot him "[t]o make sure he don't get up" and "to keep him down." Although Malone would not ultimately admit that he intended to kill Green, his own statements—on tape and afterward—as well as the two close-range shots fired purposefully into the back of Green's head, leave no reasonable doubt about Malone's intent.

¶ 40 Furthermore, although Malone presented an impressive expert on methamphetamine and its potential effects generally, Dr. Smith's case-specific testimony about Malone and his likely mental state at the time of the shooting was thoroughly and convincingly impeached by the State.[74] The State demonstrated, through cross examination, that Smith had met with Malone for at most two hours, on a single occasion, in the middle of his trial; that Dr. Smith was remarkably unquestioning when it came to accepting the credibility of Malone's statements; that he could not verify Malone's reports regarding the extent of his drug use at the time; that he did not talk to any of Malone's family members; and that Dr. Smith did not seriously consider or take into account evidence that contradicted Malone's account to him.[75]

¶ 41 In fact, Dr. Smith acknowledged that up until the preceding weekend, Malone had maintained (and Smith's expected testimony had been) that Malone had a "total blackout" about the shooting and did not remember anything, but that after meeting with Smith—who informed Malone that such memory loss "didn't make sense" in the methamphetamine context—Malone finally provided what Dr. Smith "perceived was an accurate history," i.e., the story about Malone hearing voices.[76] Smith acknowledged

---

S.Ct. at 1837. The Court noted that the evidence of materiality in that case was "overwhelming." Id.

71. Cf. Brown v. State, 1989 OK CR 33, ¶¶ 9–10, 777 P.2d 1355, 1358 (although trial court erred in modifying first-degree manslaughter instruction, by omitting "heat of passion" element, new trial not required where "evidence clearly showed appellant had a design to effect death").

72. The State apparently made exhibit boards from the transcript of the Dashcam video, which it went through line by line with Malone on cross examination, to demonstrate that his exchange with Green was entirely logical and result-oriented. Defense counsel objected to the State's use of these demonstrative exhibits at trial, but Malone raises no challenge to this tactic on appeal.

73. In all of Malone's statements to his friends after the shooting, he consistently depicted the incident as one in which he knowingly and intentionally killed the highway patrol trooper who was attempting to arrest him. In fact, the allegation of hearing "voices" around the time of the shooting was not even raised by Malone or his

counsel until after the State had rested its case—after Malone met with Dr. Smith over the weekend break.

74. Dr. Smith acknowledged that he was neither a psychiatrist nor a psychologist and that he had not administered any tests on Malone. At one point Smith testified, "[M]y only role was to interview him to determine whether he had a methamphetamine addiction problem."

75. When cross examined about the fact that Malone talked to four different people about what happened and consistently described the events as him purposefully killing the trooper, with no mention of "voices" or seeing nonexistent threats, Smith simply maintained that "there was a lot of conflict in the record" and that he "really [had] no opinion on that." Smith testified that his evaluation of Malone was based upon the Dashcam video and Malone's statements to him.

76. Smith acknowledged that Malone lied to him about not remembering what had happened. Smith testified, however, that Malone told him that the reason he had not previously informed

that there was nothing in the Dashcam exchanges between Malone and Green that was illogical or that suggested Malone was delusional. Smith was also forced to acknowledge, when presented with the extensive evidence about Malone's efforts to avoid being caught, that all of these actions were examples of "logical, goal-oriented behaviors," and that all of them "speak against brain impairment." [77]

¶ 42 Although Malone presented a bare prima facie case of intoxication and was able to produce an expert who would say that he didn't think Malone "could have formed the intent to commit murder in the first degree," Malone's testimony and that of his expert were thoroughly and convincingly impeached on the issue of whether Malone could have and did deliberately intend to kill Trooper Green. While Malone may well have experienced "methamphetamine psychosis" at some point, such as when he "saw Big Foot," no reasonable juror could have concluded, based upon the entire record in this case, that he was in such a state at the time he shot Green or that he did not deliberately intend to kill Green. Consequently, although we find plain error in the trial court's failure to properly instruct Malone's jury on his voluntary intoxication defense, we do not hesitate to conclude that this error was harmless beyond a reasonable doubt in this case.

¶ 43 In Proposition II, Malone raises a claim of first-stage prosecutorial misconduct, asserting that the State's cross examination of Malone was too long and unnecessarily adversarial and that the cross examination of Dr. Smith was overly argumentative. [78] We evaluate such claims to determine whether the challenged actions so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon. [79]

■ ¶ 44 This Court does not accept Malone's assertion that the prosecutor's tough questioning of these crucial defense witnesses was improper. As noted above, the testimony of these two witnesses contained much that was worthy of pointed and thorough impeachment. [80] In fact, Malone acknowledges that the prosecutor was entitled to challenge these witnesses on the topics at issue; Malone just thinks he should have been a bit gentler and less repetitive in doing so. [81] This Court continues to insist that the State treat all witnesses, including a testifying defendant, with dignity and respect and that the trial court has a continuing duty to maintain the dignity and decorum of the courtroom during trial. [82] This does not mean that a testifying defendant must be treated with kid gloves. Malone recognizes that "defense counsel utterly failed to object

his current counsel about what he remembered was that a former attorney had told him not to do so.

77. Smith used the phrases "logical, goal-oriented behaviors" that "speak against brain impairment" like a mantra in his testimony on cross examination.

78. Malone asserts that the "lengthy cross-examination of the defendant was excessively argumentative, resembling nothing so much as an interrogation under hot lamps," and that the conduct "was hardly any better during the cross-examination of defense expert David Smith."

79. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974) (consider whether challenged conduct made trial "so fundamentally unfair as to deny [defendant] due process"); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.' ") (quoting *DeChristoforo* ).

80. For example, Malone challenges the questioning of Dr. Smith about whether he could verify Malone's account of the amount of Lortab he was taking. This was proper cross examination.

81. Malone's brief states: "That is not to say that these were not all legitimate lines of inquiry, but it was not necessary or appropriate for Mr. Schulte to continue to badger Appellant about things he either expressly denied, explained, or stated that he could not remember."

82. *Cf. Mitchell v. State*, 2006 OK CR 20, ¶ 101, 136 P.3d 671, 710 ("We conclude that the manner in which the prosecutor presented his closing argument—yelling and pointing at the defendant as he addressed him directly—was highly improper and potentially prejudicial."); *see id.* at ¶ 102, 136 P.3d at 710 ("Trial judges are responsible for protecting and upholding the honor, dignity, and integrity of the proceedings held before them.").

to most of" the now-cited questioning-probably because it was largely unobjectionable. While particular questions and comments may have been inappropriate, and the cross examination of Malone could have been more efficient, we do not hesitate to conclude that the challenged cross examinations did not constitute prosecutorial misconduct.[83] Malone's trial was certainly not rendered unfair thereby.[84]

¶ 45 In Proposition III, Malone raises various challenges relating to the presentation of victim impact evidence in his case. He asserts: (1) that victim impact evidence, in general, is unconstitutional and has no appropriate role in Oklahoma's capital sentencing scheme; (2) that allowing victim impact witnesses to give a recommendation regarding the defendant's punishment violates the Eighth Amendment; (3) that the sentencing recommendation delivered by Mrs. Green, the victim's wife, exceeded the scope of a permissible sentencing recommendation and was highly prejudicial; (4) that testimony quoting birthday cards from the victim to his mother and sister was improper and inadmis-

sible hearsay; and (5) that overall, the victim impact testimony at Malone's trial was too long and overly emotional. We take up these issues in turn.

¶ 46 Malone's general challenge to victim impact evidence has been repeatedly raised by defendants and repeatedly rejected by this Court.[85] We rely upon the Supreme Court's decision in *Payne v. Tennessee*,[86] along with the precedents of this Court following *Payne*, all of which recognize the limited but appropriate role of victim impact evidence within the second stage of a capital trial.[87] Hence we again reject this challenge to victim impact evidence as a whole.

¶ 47 This Court has likewise previously addressed and rejected Malone's challenge to allowing victim impact witnesses to recommend a particular sentence to the jury.[88] In *DeRosa v. State*, we recently acknowledged that "although the Supreme Court had earlier forbidden such evidence, the decision in *Payne* left open the question of the validity of such evidence."[89] Malone strongly urges

---

83. Malone states that a number of the prosecutor's questions were not "necessary." Necessity, standing alone, is not the measure of misconduct.

84. And defense counsel's failure to object to the cited exchanges did not prejudice Malone.

85. See, e.g., Cargle v. State, 1995 OK CR 77, ¶ 75 n. 15, 909 P.2d 806, 828 n. 15, habeas relief granted on other grounds in Cargle v. Mullin, 317 F.3d 1196 (10th Cir.2003); see also DeRosa v. State, 2004 OK CR 19, ¶ 83 n. 142, 89 P.3d 1124, 1153 n. 142 (citing cases).

86. 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

87. See, e.g., Cargle, 1995 OK CR 77, ¶¶ 68–71, 909 P.2d at 826–27 (discussing appropriate role of victim impact evidence within Oklahoma's capital sentencing scheme).

88. See, e.g., Ledbetter v. State, 1997 OK CR 5, ¶¶ 26–29, 933 P.2d 880, 890–91 (recognizing Oklahoma's legislative authorization of victim sentencing recommendations and finding no general constitutional ban to such testimony); Conover v. State, 1997 OK CR 6, ¶ 62, 933 P.2d 904, 920 (victim sentencing recommendations do not violate the Eighth Amendment).

89. DeRosa, 2004 OK CR 19, ¶ 81, 89 P.3d at 1151 (citing Payne, 501 U.S. at 830 n. 2, 111

S.Ct. at 2611 n. 2); see also Murphy v. State, 2002 OK CR 24, ¶ 41, 47 P.3d 876, 885. Indeed, Payne specifically stated that its holding was "limited to" the admissibility of "evidence and argument relating to the victim and the impact of the victim's death on the victim's family." 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2. The Payne opinion noted that Booth v. Maryland "also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment," but that such evidence was not presented in Payne. Id.; see Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Hence the Payne Court declined to comment upon the constitutionality of allowing victim impact witnesses to recommend a particular sentence for a defendant. In Justice O'Connor's concurring opinion, joined by Justices White and Kennedy, she emphasized that the Court's Payne decision did not address the constitutionality of second-stage "opinions of the victim's family about the crime, the defendant, and the appropriate sentence." 501 U.S. at 833, 111 S.Ct. at 2612 (O'Connor, J., concurring). Although earlier cases from this Court indicated that Payne had "implicitly overruled" Booth on this issue, see Conover, 1997 OK CR 6, ¶ 60, 933 P.2d at 920; see also Ledbetter, 1997 OK CR 5, ¶ 27, 933 P.2d at 890–91, more recent authority from this Court has clarified our understanding of the Supreme Court's position on this issue.

that this Court adopt a "more appropriate" response to the failure of *Payne* to address this question and that we join the numerous other jurisdictions that have ruled (post-*Payne*) that a victim family member's sentence recommendation is always irrelevant to a capital sentencing.[90] We note that defense counsel failed to raise this issue in the dis-

trict court; and we decline to revisit this issue in a case in which it was waived.[91]

¶ 48 We consider, instead, the specific victim impact evidence presented in Malone's case. On December 1, 2004, Malone's counsel filed a Motion to Produce Victim Impact Statement, as well as a Motion for In Cam-

90. Malone also argues that the specific statutory language at issue, *citing* 22 O.S.2001, §§ 984, 984.1, does not actually allow victims and family members to ask a jury for a particular sentence, but rather only allows them to express their "opinion" to the court, at formal sentencing, about the sentence already "recommended" by the defendant's jury. This same view was expressed by Judge Lane (and joined by Judge Strubhar) in some of this Court's earliest victim impact cases. *See, e.g., Ledbetter,* 1997 OK CR 5, 933 P.2d at 902–03 (Lane, J., concurring in result); *Conover,* 1997 OK CR 6, 933 P.2d at 923–25 (Lane, J., concurring in result). This view, however, has never been able to gain the support of a majority on this Court; and a recent amendment to § 984.1(A) confirms this Court's consistent interpretation that the language of this provision *is* intended to apply to victim impact evidence presented to a capital sentencing jury. *See* 22 O.S.Supp.2006, § 984.1(A) (adding language noting that cross examination of victim impact witnesses must be permitted "in a proceeding before a jury . . .") (effective November 1, 2006).

91. Malone emphasizes, correctly, that even though our legislature has approved this kind of evidence, this Court always retains the obligation to evaluate the constitutionality of statutes, when they are properly challenged in a criminal case. I personally agree with Malone and would vote to hold that sentencing recommendations from victim family members in capital cases always violate Due Process and the Eighth Amendment, because they are irrelevant to the jury's sentencing determination.

Since the U.S. Supreme Court's 1976 decision in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), it has been a guiding principle of death penalty law in this country that the decision about whether or not a person convicted of first-degree murder should be sentenced to death should be based upon an individualized consideration of the defendant's crime and his or her character/background. Justice Stewart's plurality opinion in *Woodson* asserted: "[T]he fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* at 304, 96 S.Ct. at 2991 (internal citation omitted). This has been a bedrock principle of capital jurisprudence in this country ever since. *See, e.g., Lockett v. Ohio,* 438 U.S. 586,

603–604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978) (quoting and relying upon *Woodson* to conclude that capital defendant must be allowed to present virtually any evidence relating to crime committed and defendant's character/background); *see also Roberts v. Louisiana,* 431 U.S. 633, 636, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637 (1977) (per curiam) (quoting *Woodson*); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982) (same); *Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) (same); *Blystone v. Pennsylvania,* 494 U.S. 299, 304, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990) (same); *Tuilaepa v. California,* 512 U.S. 967, 976, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994) (same).

Yet the recommendations of grieving victim's family members about whether or not *they* want the defendant to be sentenced to death is totally irrelevant to the jury's individualized evaluation of the defendant and the crime. And such sentencing recommendations are also not justified by the logic of *Payne,* which allows the jury to find out some basic information about the victim whose life was taken. Such recommendations do reveal something about the feelings and moral sensibilities of the persons left behind; yet this information is simply not relevant to the jury's capital sentencing decision in our system. Furthermore, in my view, this evidence is simply *too* powerful—bringing with it the very real potential of "swamping" all the other factors and considerations that a capital jury is required to evaluate within its sentencing determination.

It should be noted that this view, *i.e.,* that capital sentencing recommendations by victim family members remain unconstitutional post-*Payne,* is also the view of the Tenth Circuit Court of Appeals and the highest courts of numerous States that allow the death penalty, as well as other appellate courts that have examined the issue. *See, e.g., Hain v. Gibson,* 287 F.3d 1224, 1238–39 (10th Cir.2002); *Fryer v. State,* 68 S.W.3d 628, 630 (Tex.Crim.App.2002) *Ware v. State,* 360 Md. 650, 759 A.2d 764, 783 (2000); *People v. Harris,* 182 Ill.2d 114, 230 Ill.Dec. 957, 695 N.E.2d 447, 467 (1998); *Farina v. State,* 680 So.2d 392, 399 (Fla.1996); *State v. Muhammad,* 145 N.J. 23, 678 A.2d 164, 172 (1996); *State v. Taylor,* 669 So.2d 364, 370 (La.1996); *State v. Pirtle,* 127 Wash.2d 628, 904 P.2d 245, 269 (1995); *State v. Hoffman,* 123 Idaho 638, 851 P.2d 934, 941 (1993); *Ex parte McWilliams,* 640 So.2d 1015, 1017 (Ala.1993); *Parker v. Bowersox,* 188 F.3d 923, 931 (8th Cir.1999).

era Hearing Regarding Victim Impact Statement, asking that the State be required to produce the victim impact evidence that it intended to use at trial and that the district court hold the required hearing (citing *Cargle* ) regarding the admissibility of this evidence. On April 4, 2005, the district court issued an order resolving most of Malone's pending motions, within which the court noted that the State had "agreed to produce victim impact statements, if necessary prior to such statements being introduced at trial." This same order also summarily granted Malone's motion for an in camera hearing on the victim impact statements.

¶ 49 The record in this case does not establish that the State ever produced its victim impact evidence, however, defense counsel conceded at oral argument that this evidence was provided to defense counsel prior to trial. The record also contains no indication that a hearing was ever held before the district court about this evidence; and the State conceded at oral argument that it could not find any evidence that a *Cargle* victim-impact hearing was held in this case.[92] In fact, the transcribed hearings and trial rec-

ord in this case contain no substantive discussion of this evidence prior to its introduction at Malone's trial—and no objection from defense counsel in this regard.[93] In addition, this Court notes that the second-stage instructions provided to Malone's jury failed to include the required uniform instruction informing the jury about the role of victim impact evidence in the jury's sentencing determination.[94] Yet defense counsel failed to raise any objection to any aspect of the victim impact testimony that was introduced at trial or to the failure of the jury instructions to address this issue.[95] Hence we review only for plain error.[96]

¶ 50 The State presented three victim impact witnesses at Malone's trial: Nita Bowles (the victim's mother), Karen Huyssoon (the victim's sister), and Linda Green (the victim's wife).[97] After asking Bowles a few questions, to establish that she was the mother of two children, Nikky Green and Karen Huyssoon, the prosecutor essentially turned the stage over to Bowles, who provided a narrative that covers over thirteen transcript pages, without interruption by either question or objection.[98] Following a brief recess, the

92. See *Cargle*, 1995 OK CR 77, ¶ 76, 909 P.2d at 828 ("[T]he State should file a Notice of Intent to Produce Victim Impact Evidence, detailing the evidence sought to be introduced; and an in-camera hearing should be held by the Trial Court to determine the admissibility of the evidence.").

93. The curious silence of the district court record is continued at the appellate level, since Malone's appellate counsel fails to note this incomplete procedural history in his current appeal.

94. See OUJI–CR(2d) 9–45. This instruction was promulgated in *Cargle*, wherein this Court ordered that it was "to be used in all future capital murder trials where victim impact evidence has been introduced." See *Cargle*, 1995 OK CR 77, ¶ 77, 909 P.2d at 828–29. Once again, however, this failure is not noted or challenged within Malone's brief on direct appeal.

95. In Proposition X, Malone asserts that defense counsel's failure to object to the now-challenged victim impact evidence constituted ineffective assistance of trial counsel.

96. *Wackerly v. State*, 2000 OK CR 15, ¶ 59, 12 P.3d 1, 18.

97. The State concluded its second-stage case by presenting these three witnesses.

98. Bowles provided a basic history of her son's life, from the perspective of his mom. She began with her marriage to his father and how five years later they were "wonderfully blessed" with a healthy son. She described their life and parenting style, how careful they were not to overindulge Green, how dependable and loving he was even as a young child, how he grew up and graduated from college and got married, and how he asked her to be there when each of his daughters was born. Bowles testified about how tender and gentle Green was and how much he helped both her and her daughter when they went through divorces and when each of them went through a health crisis. She testified about how Green struggled in the Oklahoma Highway Patrol Academy, how he asked for her prayers to get him through, how he would check on her regularly, since she lived alone, and how he would tell her, "I love you mama. I'm still your little boy." She also read from a birthday card he had given her. (The introduction of this card into evidence is addressed *infra*.) Bowles testified about how she was most proud of her son when he got baptized and was later ordained a deacon and a minister. She testified about how she got him some special t-shirts that he had requested for Christmas, how they were planning to get together later that week for a family celebration, how she wanted to call him on Christmas Day but didn't, and how she left the t-shirts

State then presented the testimony of Karen Huyssoon. After some basic questions to establish that she was the sister of Green and was married and had three children of her own, the prosecutor again simply let this witness present a narrative.[99] Huyssoon's victim impact testimony covers approximately six transcript pages.[100]

¶ 51 The final witness for the State was Linda Green, wife of Nik Green and mother of their three daughters.[101] She testified that the family lived next to the First Baptist Church in Devol, Oklahoma, because her husband had been the youth pastor and associate pastor there. She testified about what she overheard from their bedroom on the morning of December 26, 2003, when someone came to their door, and about her husband coming to kiss her good-bye, already in uniform, and telling her he was "going to go 10–8" early that day. She then described her mounting anxiety that morning, as she began to get information that something might be wrong and was eventually informed, by the dispatcher, that her husband was dead. After describing her reaction to this horrifying news, Mrs. Green suggested that the easiest way for her to provide her victim impact testimony was to read from her prepared statement.

¶ 52 In this prepared statement, which covers over nine transcript pages, Mrs. Green described how she felt like she "prayed Nik into [her] life," since she prayed that God would send her "a Godly man, a good husband, and a loving dad," and her husband was all of these things and more.[102] She

at the funeral home after his death. She testified about the misery and numbness she experienced when she was told of her son's death and how depressed and isolated she felt afterward. She described her efforts to cope with the loss, for the sake of her grandchildren, through working in the schools. She described where Green was buried and seeing one of the white doves that was released at his service. She described spending time with Green's daughters and talking with them about what he was like. Bowles also described having a dream, in which she is out with her son at the time of the shooting and she is begging "that person," just like Green did, "Please, don't. Please don't." At the end of her testimony, Bowles apologized that she had "kind of messed this up," apparently by going off her scripted victim impact statement. The prosecutor then asked her if she had a request of the jury regarding punishment, and she answered, "I request the death penalty." There was no cross examination.

99. The prosecutor directed Huyssoon: "Just tell them what you'd like them to know about him."

100. Huyssoon began by reading from a birthday card her brother had given her. (The propriety of this evidence is discussed *infra*.) She described how blessed she was to have such a wonderful big brother, who would have done anything in the world for her. She described their childhood and how they spent almost all their free time together, playing games, working on the farm, sometimes fighting but never tattling (because neither could stand to see the other punished), and how Green would scare her and she would pester him. She described how they supported each other when their father died unexpectedly, how Green was her "rock through a terrible divorce and custody battle," how he brought her through surgery and looked after her

three children, how she was there when his children were born, and how he stood beside her when she got married. Huyssoon testified how much she and Green enjoyed sharing stories about their children and how they wanted to live close to each other, so their children could grow up together. She testified that when their mother eventually died, she'd be alone. She described having nightmares about the morning Green was killed, reliving his final ten minutes every night, and how she wished she could have traded places with him. She also described the reactions of Green's wife, their mother, and herself to the news of his death and how it scared her children. And she described the look in the eyes of Green's three daughters on the day they went in to view their daddy's body. Huyssoon testified that she had trouble sleeping and eating for the first six months, "because it didn't seem fair" that Green could no longer eat, and how helpless and awful she continued to feel when others in the family cried. She testified that words could not express how much she missed her brother and that she wished she could tell him "what an awesome example he was to me and how much I loved him." She noted that Christmas would never be the same, that a huge part of herself died when her brother died, and that nothing could ever fill that void. Finally, after a question from the prosecutor about whether she would like to request a specific sentence, Huyssoon concluded by stating, "I would like to request the death penalty." There were no objections and no cross examination.

101. Mrs. Green testified that at the time of the trial, over seventeen months after the murder, their daughters were 10, 7, and 3 years old.

102. Mrs. Green described how six months after she prayed for such a man, she and Nik Green began dating, and she knew "he was the one that

described being in denial about his death for months and about how hard it was to find herself raising three children alone. She described experiencing deep, gripping, physical pain, which she attributed to "broken heart syndrome," and having difficulty breathing and feeling her heart racing, with no apparent physical cause. She also described the emotional struggles of "living single in a double world" and always feeling "lost and out of place." Mrs. Green testified that she had lost her best friend and soulmate, but that the hardest thing was "to press on with our daughters." She testified that their oldest child, Cortni, suffered from depression and severe headaches and had become afraid of the dark; that their middle daughter, Brooklyn, suffered from abdominal pain, for which a physical cause couldn't be found, and that she wouldn't talk about her feelings and fears to anyone; and that their youngest child, Morgyn, frequently had nightmares and pronounced separation anxiety.

¶ 53 Mrs. Green testified that prayer had always been important in the family, but that now their prayers "reflect pain and their longing for their dad." She testified about how she wanted to lift the spirits of the family toward the future, but that they were "caught in the present, our lives revolving around what we've lost, and, quite frankly, who is responsible for putting us in this situation." She testified that birthdays, anniversaries, and holidays had become "horrible experiences that we just have to endure and just hope that we can get the day over with as soon as possible." She added that "the most painful thought" she could conjure up was of the future weddings of her three daughters, with "no proud father to walk them down the aisle."

¶ 54 Mrs. Green then concluded her testimony with the following recommendation of punishment for Malone:

I know, as you all do here today, that Nik begged for his life that day. He asked for mercy. There was no mercy shown. Here on earth our government and those in positions of authority, including law enforcement, are given a devine [sic] charge outlined in Romans 13 of the Holy Bible. Nik took that charge very seriously every time he went 10-8. Perhaps that is why he was honored to be named Trooper of the Year two of the six years he proudly served the citizens of the State of Oklahoma.

Also found in that same chapter of the book of Romans is our charge as citizens to do our duties and obligations, including those as jurors in a court of law, as a devine [sic] undertaking in upholding and enforcing the laws of our country. We know that Nik was murdered beyond a reasonable doubt. It is for this reason today, ladies and gentlemen, that I beseech you to show no mercy to him. I beg for you to give him the maximum penalty under the laws of the State of Oklahoma, which is the death penalty, and leave the business of mercy for Malone in the hands of the Heavenly Father, where it belongs.

Defense counsel asked only a few questions, in an attempt to establish that since her husband's death, Mrs. Green had spoken at schools and other organizations about the dangers of methamphetamine and how it can ruin lives.

¶ 55 The State acknowledges that this Court has consistently held that victim sentencing recommendations should be limited to "a straight-forward, concise response to a question asking what the recommendation is" or "a short statement of recommendation in a

God had provided." She described their shared Christian backgrounds and values, how they waited to get married until Nik had graduated from college, and how their first daughter was born two years later. She testified about her husband's calling to law enforcement, how he began as a reserve deputy and ultimately realized his dream of graduating from the Oklahoma Highway Patrol Academy, just before the birth of their second child. Mrs. Green also testified about her husband's other calling, to serve the Lord as a minister, and how they got increasingly involved in the First Baptist Church in Devol, particularly in youth ministry. She described the birth of their third child, who was "daddy's sugar," and how close she was to her daddy. Mrs. Green described how her husband was surrounded by women in their family and how he loved taking care of all of them. She testified that her husband had a "servant's heart," which was why he was happy to help the young lady who came to their door that December morning.

written statement, without amplification." [103] The State does not attempt to argue that Mrs. Green's sentencing recommendation can pass this test—or even that it is not plain error. Rather, the State argues that any error in this regard was harmless, in light of the totality of the evidence presented at Malone's trial.

¶ 56 We find clear plain error in this regard. We do not blame or criticize this grieving, widowed spouse for her statements or question the sincerity or appropriateness of the feelings she expressed. Nevertheless, the parties who are repeat players in our criminal justice system—the trial court, the prosecutor, and defense counsel—all had an obligation to ensure that her victim impact testimony was appropriately limited, in the manner required by this Court.[104] We are particularly troubled by Mrs. Green's sentencing recommendation, which so obviously violates the simple rules established by this Court.

¶ 57 Mrs. Green literally "beseeches" and "begs" the jury to sentence Malone to death. She focuses on the idea of mercy,

notes that her husband begged for mercy, but was given none, and implores the jury to show "no mercy" to Malone and "leave the business of mercy for Malone in the hands of the Heavenly Father, where it belongs." Furthermore, and particularly troubling to this Court, Mrs. Green invokes the Bible and suggests that jurors have a religious obligation, beyond civic duty, in their work as jurors, in a way that seems to suggest that giving a death sentence may be part of the jury's "divine undertaking in upholding and enforcing the laws of our country." This invocation of religious belief and obligation in the context of a capital sentencing recommendation is totally inappropriate.[105] We find that the trial court committed plain error in allowing this extended and unduly prejudicial sentencing recommendation to be presented at Malone's trial.[106]

¶ 58 Malone also challenges the victim impact testimony of Nita Bowles and Karen Huyssoon, in which they describe and read from birthday cards that Green sent them prior to his death.[107] The record does

---

**103.** *Dodd v. State,* 2004 OK CR 31, ¶ 101, 100 P.3d 1017, 1046 (quoting *Welch v. State,* 2000 OK CR 8, ¶ 46, 2 P.3d 356, 374); *Ledbetter,* 1997 OK CR 5, ¶ 31, 933 P.2d at 891 ("Any opinion as to the recommended sentence should be given as a straightforward, concise response to a question asking what the recommendation is; or a short statement of recommendation in a written statement, without amplification."); *see also Conover,* 1997 OK CR 6, ¶ 70, 933 P.2d at 921 (recommendation of sentence "should be limited to a simple statement of the recommended sentence without amplification").

**104.** This Court noted in *Ledbetter* that trial courts "must use extraordinary care" in evaluating victim sentencing recommendations and that "while theoretically admissible, this evidence will be viewed by this Court with a heightened degree of scrutiny as we apply the probative-value-versus-prejudicial-effect analysis." 1997 OK CR 5, ¶ 31, 933 P.2d at 891; *see also Conover,* 1997 OK CR 6, ¶ 69, 933 P.2d at 921 (noting "heightened degree of scrutiny" for such recommendations).

**105.** *See Washington v. State,* 1999 OK CR 22, ¶ 61 & n. 13, 989 P.2d 960, 978 & n. 13 (finding that letter from father of murder victim, which stated "Our Bible say's [sic] eye for eye" and requested that the jury "[p]lease just accomlish [sic] the right Godly justice," "exceeded the bounds of permissible victim impact evidence given the overamplified request for the death penalty and the biblical references"); *see also*

*Long v. State,* 1994 OK CR 60, ¶ 48, 883 P.2d 167, 177 ("[I]mplying God is on the side of a death sentence is an intolerable self-serving perversion of Christian faith as well as the criminal law of this State."). This Court has recognized that it is not improper in a victim impact statement to address "the victim's religious preferences, so long as this evidence does not dominate the statement." *Ledbetter,* 1997 OK CR 5, ¶ 25, 933 P.2d at 890.

**106.** We address whether this error can be considered "harmless" or not *infra.*

**107.** Bowles testified that in her card Green wrote, "Thank you, Mama, for raising me the way you did. Now I know, since I'm raising my three girls, and I appreciate it." She testified that he also wrote, "Thank you for sharing Jesus Christ with me, and making me do what was right." Huyssoon described the front of her card, which contained a picture of a little boy and girl and the writing, "Love to my sister on her birthday," as well as the inside of the card, which said, "Many of my happiest memories have been made side by side with you." Huyssoon testified that Green added the following handwritten note to her card:

We've had a lot of fun and good times together. I have a special feeling of closeness to you, although I don't see or talk to you each day. I occasionally thought of you when you were

not indicate whether the cards were displayed to the jury; they were not admitted into evidence. In *Washington v. State*,[108] this Court ruled that a letter from a victim to her parents, which was read by the district attorney, did not constitute proper victim impact evidence, "as it was written prior to the murder and does not address how [the victim's] murder affected her family."[109] This Court acknowledged that the letter "arguably is evidence about some personal characteristics of the victim," since it showed some aspects of the kind of person she was.[110] Nevertheless, we held that "the letter is hearsay for which no exception applies and its admission was error."[111] The State argues that Green's letters were admissible to demonstrate the victim's "state of mind," but fails to explain why this is relevant to Malone's capital sentencing.[112]

■ ¶ 59 We find that the rule of *Washington* applies and that the victim's mother and sister should not have been allowed to read from their cards from the victim. Because defense counsel failed to object to this evidence at trial, we review it only for plain error. The applicability of *Washington* is clear; hence we find that the admission of this evidence was plain error. We note that if this evidence was the only improper victim impact evidence presented, we would find that this error was harmless. Yet these cards were but a small portion of the exten-

sive victim impact evidence presented at Malone's trial.

¶ 60 Hence Malone also asserts that, overall, the victim impact testimony presented in his case was too long and overly emotional. We note that the victim impact testimony in this case comprises nearly thirty-six transcript pages, of which twenty-eight pages were in the form of uninterrupted narrative. While this Court declines to adopt specific rules governing the length of such testimony, we note that we have previously held that such statements should not be "lengthy" and that they should contain only a "quick glimpse" of the life that has been extinguished.[113] Victim impact statements were never intended to be—and should not be allowed to become—eulogies, which summarize the life history of the victim and describe all of his or her best qualities. The Supreme Court's decision in *Payne*, as well as this Court's subsequent decisions recognizing the legitimacy of victim impact evidence in capital sentencing proceedings in Oklahoma, are all based upon the idea that the State should be allowed to present some basic evidence about the victim and his or her admirable characteristics, in order to remind the jury that the victim is more than just a corpse and to "balance" the array of mitigating evidence that a capital defendant can present about his or her background and admirable qualities.[114]

---

little as a pest [indicating], but I certainly did and continue to truly love you. I look back on all of it and love that I was and I am blessed [indicating] to have you as my little sis. Happy birthday. Brother (Nik)

**108.** 1999 OK CR 22, 989 P.2d 960.

**109.** *Id.* at ¶ 60, 989 P.2d at 977–78.

**110.** *Id.* at ¶ 60, 989 P.2d at 978.

**111.** *Id.* (citations omitted); *see also Ledbetter,* 1997 OK CR 5, ¶ 48, 933 P.2d at 895 (noting that hearsay statements outside of recognized exceptions are "just as inadmissible in a victim impact statement as [they are] in any other form of evidence presented at trial") (citing *Conover*).

**112.** And this Court finds that the letters were not admissible on this basis.

**113.** *See Ledbetter,* 1997 OK CR 5, ¶ 24, 933 P.2d at 890 (cautioning that victim impact evidence

"should not be lengthy"); *Cargle,* 1995 OK CR 77, ¶ 75, 909 P.2d at 828 (evidence about victim's "personal characteristics should constitute a 'quick' glimpse" of the victim's life) (citing *Payne,* 501 U.S. at 830, 111 S.Ct. at 2611).

**114.** In *Cargle,* this Court, relying upon the rationale and language of *Payne,* summarized the legitimate purpose of victim impact evidence as follows:

[V]ictim impact evidence is permissible because "the State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."
1995 OK CR 77, ¶ 69, 909 P.2d at 826 (quoting *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608); *see also Conover,* 1997 OK CR 6, ¶ 64, 933 P.2d at 920 (finding that improper victim impact evi-

¶ 61 We conclude that the testimony of the victim impact witnesses in this case goes well beyond the limitations established by this Court for appropriate victim impact evidence. In *Cargle*, this Court's seminal case on victim impact evidence, we noted that Oklahoma's statutes on victim impact evidence clearly limit this evidence to the " 'financial, emotional, psychological, and physical effects,' or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim." [115] We noted that testimony about the personal characteristics of the victim "should constitute a 'quick' glimpse" of the life that the defendant extinguished and that this evidence "should be limited to showing how the victim's death is affecting or might affect the victim's survivors, and why the victim should not have been killed." [116] Our *Cargle* decision warned that victim impact testimony focused mainly upon the emotional impact of a victim's death "runs a much greater risk of [being] questioned on appeal." [117] And while there have been some adjustments to this Court's understanding of what can qualify as victim impact evidence,[118] the basic rules that govern and limit this evidence have not changed in the over eleven years since *Cargle*.

 ¶ 62 We conclude that the overall victim impact evidence presented in this case was indeed "too much"—both too long and too emotional. This Court recognizes that the determination of how much victim impact testimony to allow and when that testimony is "too emotional" is a subjective determination, which necessarily rests, in the first instance, with the sound discretion of the trial court. Hence the admission of victim impact testimony—both what is admitted and how much is admitted—is necessarily reviewed by this Court only for an abuse of that discretion. Of course when the record suggests that the district court failed to *exercise* its discretion over the admission of this evidence—by failing to review and evaluate it prior to its presentation at trial—our review is less deferential. In the current case, where the record is silent regarding any pre-admission trial court oversight, we find that the trial court abused its discretion by failing to constrain the amount and content of the victim impact evidence presented at Malone's trial.

 ¶ 63 Although the record does not establish that the State provided adequate notice regarding its victim impact evidence, defense counsel acknowledged at oral argument that Malone's trial counsel was provided this evidence prior to trial.[119] Yet providing notice does not exhaust the State's responsibility in this regard. As officers of the Court, prosecutors are duty-bound to assist and guide their victim witnesses, to

dence "weigh[ed] the scales too far in favor of the prosecution").

**115.** *Cargle*, 1995 OK CR 77, ¶ 74, 909 P.2d at 828 (quoting 22 O.S.Supp.1993, § 984).

**116.** *Id.* at ¶ 75, 909 P.2d at 828 (internal citations omitted). This Court summarized:

Mitigating evidence offers the factfinder a glimpse of why a defendant is unique and deserves to live; victim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family.

*Id.* at ¶ 75, 909 P.2d at 828.

**117.** *Id.* at ¶ 81, 909 P.2d at 830. We added: "The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a 'reasoned moral response' to the question whether a defendant deserves to die;

and the greater the risk a defendant will be deprived of Due Process." *Id.*

**118.** For example, in *Cargle*, this Court found that testimony about what the victim was like as a child, *i.e.*, that he was "a cute child at age four," did not fit *any* of the criteria for permissible victim impact evidence, and in particular, that it did not show how the death "financially, emotionally, psychologically, [or] physically impacted" on the victim's family. *Id.* at ¶ 80, 909 P.2d at 829. Yet in *Conover*, 1997 OK CR 6, ¶ 66, 933 P.2d at 921, this Court characterized comments about what the victim was like as a baby and growing up as relevant to "the emotional impact of the victim's death," though we still cautioned against the due process risks of such testimony.

**119.** In *Ledbetter*, this Court noted that "victim impact evidence must ordinarily be turned over to the opposing party at least ten (10) days before trial," and found that stating simply that a witness would testify regarding "the impact [the victim's] death has had on him and his family" was insufficient notice. 1997 OK CR 5, ¶¶ 42–46, 933 P.2d at 894.

ensure that their testimony is in accord with the binding precedents of this Court. In the current case, the failure of the trial court and defense counsel to take any action to ensure that this testimony was properly limited is particularly troubling. This Court finds plain error in the failure of the trial court to hold a hearing on the admissibility of the State's victim impact evidence; and we likewise find that defense counsel's performance was inadequate for failing to challenge this evidence.[120]

¶ 64 If any of the key players (the State, defense counsel, or the trial court) had properly done their job regarding this evidence, it is entirely possible that the victim impact testimony presented at Malone's trial could have been appropriately tailored, such that it would all have been admissible. As it is, this Court is left with the task of attempting to determine whether the result of this joint failure to properly screen and constrain this evidence, particularly the highly prejudicial sentencing recommendation of Mrs. Green, is nevertheless harmless beyond a reasonable doubt. We recall that Malone's jury was given no instruction on how it was to evaluate and consider the victim impact evidence, within the context of its overall sentencing decision. And we conclude that this failure likewise constituted plain error, since the required uniform instruction regarding this evidence is well established and clear.[121]

¶ 65 Nevertheless, this Court acknowledges that despite the serious and plain nature of the numerous errors committed in connection with the victim impact evidence in this case, the determination of whether these errors were harmless or not is no easy task. During the second stage of Malone's case,

the State incorporated its evidence from the first stage and presented a very substantial amount of additional evidence in support of the aggravators alleged, which we summarize herein. The State presented evidence that two years before the murder of Green, in late December of 2001, Malone assaulted Glendale Reyes, a Mexican man with cerebral palsy, by hitting him on the head from behind with a beer bottle, rendering him unconscious for ten to fifteen minutes.[122] When Reyes's girlfriend, Rachael Maldonado, attempted to push Malone away from Reyes, Malone punched her in the face. When the police arrived, they encountered Malone, whose right-hand knuckles were scraped and bloody, arrested him for assault with a dangerous weapon, and found marijuana and Lortab in his coat pocket. Malone was later charged with possession of the drugs, but not assault, since no one at the party wanted to press charges.

¶ 66 The State also presented evidence of a May 1998 incident, when Duncan police officers were called to the home of Malone and his then-wife, Beth Malone, on a domestic disturbance.[123] When officers arrived they observed an altercation between Malone and Beth in the entryway area of the home. As officers approached they ordered Malone, who was very angry, to let go of his wife, whom he was holding tightly by either her arm or her hair. Malone did not respond to these commands, and it took a while for the officers to free Beth from his grasp.[124] It also took officers a while to arrest and handcuff Malone. No charges were filed, however, because Malone's wife did not want him charged.

¶ 67 The State presented further evidence that in early September of 2003, Malone and

120. We address the issue of prejudice from inadequate performance within Proposition X *infra.*

121. *See Cargle,* 1995 OK CR 77, ¶ 77, 909 P.2d at 828–29 (promulgating uniform instruction now known as OUJI–CR(2d) 9–45 and ordering that it "be used in all future capital murder trials where victim impact evidence has been introduced"). Here again, we hold accountable all of the parties who could have prevented this error, *i.e.,* the State, defense counsel, and the trial court.

122. Malone and numerous Mexican people were attending an after-hours party at the Altus home

of a Mexican man, who, along with many of his guests, had asked Malone to leave, but Malone refused to go.

123. An affidavit from Beth Malone is attached to Malone's Application for an Evidentiary Hearing in this case and is discussed *infra* in Proposition X.

124. One of the officers testified that Malone had blood on the knuckles of his right hand.

one other firefighter, Scott Smith, were working the overnight shift at the Duncan Fire Department. When Smith woke up the next morning, he discovered a clear baggie sitting on top of the microwave, which contained a powdered substance and drug-related paraphernalia. The baggie was not there the previous night. Smith reported this to his supervisor; and the substance was field tested and came back positive for methamphetamine. When confronted Malone initially denied the baggie was his, saying it probably belonged to another firefighter, Dewayne Kaspereit.[125] Malone later acknowledged, however, that if tested, the torch lighter and other items in the baggie would likely have his fingerprints on them, since he had been "curious" about them and had handled them. Malone was ultimately charged with possession of CDS and fired from the fire department. Shortly thereafter Malone was also fired from his job as a paramedic with the ambulance service.[126]

¶ 68 The State also presented evidence that on December 15, 2003, Malone was stopped for speeding by Highway Patrol Trooper Darin Carman.[127] During the stop Carman discovered a loaded, short-barreled 12 gauge shotgun and a loaded .22 rifle.[128] Carman advised Malone that the barrel on the shotgun was too short and read and discussed with Malone the Oklahoma statute dealing with carrying concealed firearms in a vehicle. Malone was polite and responsive throughout the exchange, and Carman let him go without citing him for any of the weapons-related violations. Malone was stopped again around midnight, on the night of December 21 into December 22, 2003 (just four days before the murder), by Duncan

Police Officer Brian Attaway, this time for a defective brake light. During this stop other officers arrived with a trained drug dog, who alerted on the driver's side of Malone's truck. Malone and his passengers, J.C. and Jaime Rosser, were removed from the truck, and a search of the truck revealed a loaded .22 revolver and a stun gun in the driver's door pocket, a loaded semi-automatic Berretta .22 pistol under the front seat, a loaded .22 rifle on the back seat, and also an unloaded 12 gauge shotgun, night vision goggles, and numerous items associated with clandestine methamphetamine manufacture, including a substantial amount of ephedrine.[129]

¶ 69 The State also presented evidence about two early attempts by Malone to escape from jail and other bad behavior during the ten-month period following his arrest on December 28, 2003. The evidence presented suggests that Malone had a handcuff key with him when he was arrested and that he brought it into the Stephens County Jail by swallowing it. The evidence suggests that Malone later retrieved this handcuff key from his own feces and that on the day of Green's funeral, he faked a heart problem and was taken to Duncan Regional Hospital. While at the hospital Stephens County Sheriff Jimmie Bruner observed Malone fidgeting with something under the sheet that was covering him, but when he was confronted, Malone put the item in his mouth and swallowed it. An x-ray revealed what appeared to be a handcuff key in Malone's stomach. Malone was apparently able to retrieve this handcuff key a second time, by again going through his own feces.[130] And on January 5, 2004, as Malone was being checked prior to a

---

**125.** An affidavit from Kaspereit is attached to Malone's Application for an Evidentiary Hearing in this case and is discussed *infra* in Proposition X.

**126.** After losing both of his jobs, Malone apparently began using methamphetamine even more heavily and devoted all his efforts to manufacturing and distributing this drug.

**127.** A videotape of this stop, taken from inside Carman's vehicle, was admitted into evidence.

**128.** Carman noted that the shotgun had "no butt.... So basically it was just like a pistol and it was a pump shotgun."

**129.** As noted earlier, Malone was charged with attempted manufacture of methamphetamine, possession of precursor ephedrine, and with possessing three loaded and accessible firearms. He was released on a $50,000 bond.

**130.** Evidence was presented that Malone would defecate in the corner of his cell, even though he had a working toilet in his new cell, and that he did so directly underneath a videocamera intended to monitor his cell, *i.e.*, in an area outside the view of this camera.

scheduled transport to Cotton County Jail, Officer Tim King discovered the handcuff key in Malone's mouth and was able to recover it before Malone could swallow it again.[131]

¶ 70 Finally, the State presented evidence about a series of October 7, 2004 incidents at the Comanche County Detention Center, to which Malone had been transferred. Officers first noted that Malone was throwing paper out of the "bean hole" of his cell door and that water from his plugged toilet was flowing out underneath the door. Three officers went to his cell, restrained Malone by placing him in handcuffs and leg shackles, and ordered him to sit on a chair outside the cell. As the two other officers began clearing and cleaning the cell, Sergeant Andy Moon stood guard over Malone. Malone twice stood up, after being told to stay seated, and then began coming toward Moon, who sprayed him in the face with "OC," a chemical intended to impair a person's vision and breathing. Malone paused, but then "shook it off" and continued advancing toward Moon, at which time the other officers intervened and were able to take Malone down and get him under control.[132]

¶ 71 Later that day Benjamen Lehew, jail administrator for the detention center, met with Malone, who was very upset about the privileges Lehew had taken away from him. Malone threatened Lehew, who then ordered that Malone be placed in leg irons and handcuffs. Shortly thereafter Lehew was advised that Malone had handed the leg irons and handcuffs back to a jail officer, after escaping from them and damaging them to the point that they were no longer usable.[133] The State also presented evidence that during his initial ten months in jail, Malone managed to fashion various crude weapons, which were discovered in his cell.[134]

¶ 72 It is probably not surprising that Malone's counsel basically conceded that the three aggravating circumstances alleged by the State were met in this case; and we find that this concession was a reasonable strategy.[135] That Malone murdered Green in order to "avoid arrest or prosecution" for manufacturing methamphetamine and that Green was, at the time, a "peace officer ... killed while in performance of official duty" were both clearly established by the evidence presented in the first stage of Malone's trial. Furthermore, if there was any doubt about whether Malone was a "continuing threat to society" after the first stage, there really wasn't much doubt that his jury would reach this conclusion after hearing the State's evidence in the second stage. It seems unlikely that Malone's jury had much trouble deciding that the mitigating evidence presented at trial (which was quite limited and not particularly powerful) was substantially outweighed by the aggravating circumstances of his case.[136]

¶ 73 Thus the current case presents this Court with the dilemma of essentially excusing the commission of serious and obvious errors in the presentation of victim impact evidence in a capital trial, by ruling that all of these errors were nevertheless "harmless," or reversing the death sentence of a defendant who has committed a heinous and undoubtedly "death-eligible" crime, by sending his case back for a second capital sentencing. This Court emphasizes, as we have in the past, that although a defendant's crime may make him eligible to receive the death

131. King's testimony in this regard is further discussed infra in Proposition V.

132. Moon testified that the OC used on Malone had "325,000 burning units," but that as a result of the incident with Malone, the detention facility ordered a stronger OC, containing "2 million burning units," which is what it currently uses.

133. Lehew's testimony regarding these incidents is further discussed infra in Proposition V.

134. These potential weapons included shanks made from strung-together shards of tile, a plastic spoon, and a shaving can.

135. Malone does not challenge the sufficiency of the evidence to support the three aggravators found by the jury in his case.

136. This Court notes that Malone has raised a substantial claim on appeal that his counsel was ineffective for failing to investigate and present a significant amount of available and potentially powerful mitigating evidence on his behalf. This claim is addressed infra in Proposition X.

penalty, a jury is never obligated to sentence a defendant to death,[137] and that a single juror has the power to prevent a death sentence in a given case.[138]

¶ 74 We conclude that while Malone might have had only a slim chance of avoiding a death sentence in his original trial, the religious and duty-based plea of the victim's wife that Malone be shown "no mercy" squelched whatever slim chance he had.[139] The numerous other errors committed in connection with the victim impact evidence in this case—including the failure to hold the required hearing on this evidence, the failure to use the required instruction, the presentation of inadmissible hearsay through cards from the victim, and being both too extensive and too focused upon the emotional impact of Green's death—further strengthen this Court's determination that we cannot make a "harmless beyond a reasonable doubt" finding in the current case.[140] This Court notes that the prosecutor's final, second-stage closing argument—referring back to the family member requests for the death penalty, urging jurors to feel sympathy for these victims, who were counting on the jury to give the death penalty, and arguing that anything less than a death sentence would be "a travesty"—further enhanced the potential prejudice from Mrs. Green's impassioned plea and the other improper victim impact evidence in this case.[141]

¶ 75 We take no joy in reversing the death sentence in this case, but find that it is our duty to do so. It is the province of the jury, not this Court, to determine whether a death-eligible defendant should actually be sentenced to death; and we conclude that a new jury, which has been properly instructed and before which the State's victim impact evidence has been properly circumscribed, should make that determination in the current case.[142]

¶ 76 Even though we have determined that we must reverse Malone's death sentence, we address his other propositions—both because some of these other claims further support our decision that his death sentence must be reversed and to resolve these issues in aid of his resentencing. In Proposition IV, Malone maintains that the "avoid arrest" and "peace officer victim" aggravating circumstances are "duplicative," thereby unconstitutionally skewing the capital sentencing process in his trial.[143] Malone acknowledges that the Tenth Circuit Court of Appeals case upon which he relies, i.e., *United States v. McCullah*,[144] has subsequently been "clarified,"

**137.** Malone's jury was properly instructed, in accord with OUJI–CR(2d) 4–80, which states: "Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a sentence of imprisonment for life," with or without the possibility of parole.

**138.** In Oklahoma, if a single juror refuses to agree to a death sentence, the defendant must be sentenced to life or life without parole by the trial court, even if all eleven of the remaining jurors agree that the defendant should be sentenced to death. *See* 21 O.S.2001, § 701.11.

**139.** *See Washington*, 1999 OK CR 22, ¶ 62, 989 P.2d at 978–79 (insisting that sentencing recommendations "should be concise statements of the recommendation without amplification and reference to a higher power" and warning that "[d]eviating from these rules allows reversible error to creep in"); *id.* at ¶ 64, 989 P.2d at 979–80 (reversing death sentence and modifying to life without parole based upon improper victim impact evidence, including overamplified and religious request for death penalty, ineffective assistance, and prosecutorial misconduct).

**140.** *See Ledbetter*, 1997 OK CR 5, ¶ 84–86 933 P.2d at 902 (remanding for new capital sentencing based upon admission of improper victim impact evidence, "as we cannot say the introduction of the evidence in this particular case was harmless beyond a reasonable doubt"); *Conover*, 1997 OK CR 6, ¶ 80, 933 P.2d at 923 (remanding for new capital sentencing based, in part, upon "improperly admitted victim impact evidence").

**141.** *See* discussion of prosecutor's second-stage closing argument in Proposition XI *infra*.

**142.** *Cf. Mitchell*, 2006 OK CR 20, ¶ 110, 136 P.3d at 712 ("Although a capital jury certainly could choose to sentence [the defendant] to death even after a properly conducted resentencing, .... we find that an actual jury, not this Court, should make this call.").

**143.** This claim is often (though strangely) characterized, by parties and courts alike, as a claim that the cited aggravators are "duplicitous." Yet this challenge is about duplication, not deceit.

**144.** *See United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir.1996) (finding that "double counting of aggravating factors, especially in a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sen-

such that the accepted test for impermissibly duplicative aggravating circumstances "is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." [145]

¶ 77 This Court has taken a similar approach to claims of impermissible "double counting," by evaluating not whether the separate aggravating circumstances can be established by reliance upon the same evidence, but rather whether the separate aggravating circumstances focus upon different aspects of the defendant's crime or character. [146] This Court recognizes that the same evidence was relied upon to support the "avoid arrest" and "peace officer victim" aggravating circumstances in Malone's case. Yet these two aggravators focus upon different *aspects* of the crime at issue. The avoid arrest aggravator focuses upon the reason *why* the victim was killed, based upon the idea that it is particularly wrongful to kill another person in an attempt to avoid being arrested or prosecuted for some other crime; while the "peace officer victim" aggravator focuses upon *who* was killed, based upon the idea that it is particularly wrongful to kill an on-duty law enforcement officer. While these aggravating circumstances will often be supported by the same or overlapping evidence, they are based upon different aspects of a defendant's crime. Thus they are not unconstitutionally duplicative and do not skew the capital weighing process. This claim is rejected accordingly.

¶ 78 In Proposition V, Malone challenges the admission of testimony from two law enforcement officers about whether he is a "security risk," claiming that this testimony was (1) improper expert opinion testimony, (2) irrelevant to his trial, and (3) unduly prejudicial to the jury's sentencing verdict.

¶ 79 Tim King testified that he was the Undersheriff for Cotton County and that he had been Undersheriff for ten years. King testified that as Undersheriff, he had the responsibility of running the Cotton County Jail and that he was used to dealing with inmates. King also testified that on January 5, 2004, he went to the Stephens County Jail to pick up Malone and bring him back to Cotton County. King was preparing to transport Malone, by checking him thoroughly, when King discovered that Malone had a handcuff key in his mouth. [147] King and another transporting officer had to wrestle Malone to the ground, and King choked Malone until he passed out and they were able to retrieve the key. At the end of his testimony, King testified that he evaluated people for security risk, and when asked for his evaluation of Malone, King testified, over objection, that he considered Malone "high risk."

¶ 80 Benjamin Lehew testified that he was the jail administrator for Comanche County, that he had been in this position for two years, and that for the preceding eighteen years, he had been chief of security for the Oklahoma Department of Corrections. Lehew testified about how he was called back to

tence will be imposed arbitrarily and thus, unconstitutionally").

145.· *See Cooks v. Ward,* 165 F.3d 1283, 1289 (10th Cir.1998) (quoting *McCullah,* 76 F.3d at 1111). We note that Malone's brief effectively concedes that the challenged aggravators are not duplicative under this test, when it states as follows: "It is certainly possible for the murder to avoid arrest aggravator to apply even when the victim was not a peace officer, ... just as it is at least theoretically possible for a peace officer to be murdered in the performance of his or her duties for a purpose other than avoiding arrest."

146. *See, e.g., Wood v. State,* 1998 OK CR 19, ¶ 51, 959 P.2d 1, 14 ("[B]ecause each aggravator covers a different aspect of Appellant's criminal history, there is no overlapping of the aggravating

circumstances."); *Cannon v. State,* 1998 OK CR 28, ¶ 57, 961 P.2d 838, 853 ("Because these aggravators address different aspects of Appellant's conduct and one can be found without necessarily finding the other[ ], there is no double counting of aggravating factors ...."); *see also Smith v. State,* 1991 OK CR 100, ¶ 35, 819 P.2d 270, 278 (noting that where same evidence "is used to establish multiple aggravating circumstances referring to the same aspect of a defendant or his crime, ... only one of the duplicated circumstances should be weighed against whatever mitigating factors the jury may consider") (citing cases).

147. The transporting officers apparently knew about the prior handcuff key incident at the hospital, and they did a thorough body cavity search in preparation for Malone's transport.

the jail on October 7, 2004, because Malone was "basically out of control." [148] Lehew described meeting with Malone, who was upset about the privileges Lehew had taken away from him; and Malone essentially threatened Lehew, saying "he wasn't playing any more; he didn't care about anything, and he was going to go to OSP," meaning the Oklahoma State Penitentiary. Lehew testified that he told one of the sergeants at the jail to place Malone in leg irons and handcuffs, but that he was soon after advised that Malone had "handed the leg irons and handcuffs back," after escaping from them and damaging them to the point that they were no longer usable.[149] When asked for his evaluation of Malone as a security risk, Lehew responded, "He's a very high-risk inmate." [150]

¶ 81 In Oklahoma, lay opinion testimony must be rationally based upon the witness's perception, helpful to the jury, and not based upon "scientific, technical or other specialized knowledge." [151] Expert opinion testimony, on the other hand, is based on "scientific, technical, or other specialized knowledge" and can be provided only by a witness who is "qualified as an expert," in the field at issue, "by knowledge, skill, experience, training, or education." [152]

¶ 82 This Court finds that the security risk evaluations offered by both King and Lehew were proper expert opinion testimony.[153] These evaluations were based not merely upon personal interaction with Malone, but on the specialized knowledge and extensive experience that both men possess in the field of jail administration and security.[154] Evaluating the potential security risk of individual inmates is a natural and proper part of expertise in this field. Hence the determination by both officers that Malone was a "high" or "very high" security risk was proper expert opinion testimony. And although being a "security risk" and being a "continuing threat of violence" are not equivalent or co-extensive concepts, this security risk testimony was certainly helpful and relevant to the jury's determination on the continuing threat aggravator.[155] This Court further finds that the challenged testimony was not unfairly prejudicial and that it was properly admitted during the second stage of Malone's trial.

¶ 83 In Proposition VI, Malone asserts that Oklahoma's "continuing threat" aggravating circumstance is unconstitutionally vague and overbroad, both on its face and as applied by this Court, because it does not sufficiently narrow the class of persons eligible for the

---

148. Malone's behavior on October 7, 2004, was summarized *supra* in Proposition III.

149. Lehew testified that in his 23 years of experience, he had never seen anyone else tear up a set of cuffs or leg irons in this way.

150. Defense counsel did not object to this testimony.

151. 12 O.S.Supp.2002, § 2701.

152. 12 O.S.Supp.2002, § 2702. Expert opinion testimony is only admissible if it will "assist the trier of fact to understand the evidence or determine a fact in issue." *Id.*

153. *But see Littlejohn v. State*, 2004 OK CR 6, ¶¶ 34–35, 85 P.3d 287, 299 (characterizing as "lay opinion testimony" the testimony of a witness who had investigated multiple complaints filed against the defendant—for violent, assaultive, and dangerous behavior—that the defendant was "dangerous even in a prison setting," because this conclusion was partially based upon some personal interactions with, *i.e.*, perceptions of, the defendant). Even though King and Lehew also testified as fact witnesses, regarding one or more encounters they personally had with Malone, their risk evaluation testimony appears to have been based primarily upon their substantial experience in evaluating inmates for "security risk." Their testimony was not and did not purport to be "scientific," however; hence it was not subject to the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

154. While the State acknowledges that the security assessment of Malone by Lehew was offered as expert opinion testimony, the State argues that the assessment by King was merely lay opinion testimony, since King testified only about one particular experience he had with Malone. This Court disagrees and finds that King neither stated nor implied that his risk assessment of Malone was based entirely on his one interaction with Malone. King was apparently well aware of the prior incident with Malone, which was why he was looking so thoroughly for the handcuff key.

155. *See Littlejohn*, 2004 OK CR 6, ¶ 35, 85 P.3d at 299 (testimony that defendant was "dangerous even in a prison setting" was relevant to prove continuing threat aggravator).

death penalty from among all persons convicted of first-degree murder. This Court has previously and repeatedly rejected these challenges to this aggravator.[156] We decline to revisit the issue here.[157]

¶ 84 In Proposition VII, Malone challenges numerous items of evidence and areas of testimony admitted during the second stage of his trial to support the continuing threat aggravator. Malone failed to object to any of this evidence at trial; hence we review only for plain error.[158] We find no plain error. As defense counsel acknowledged at trial, the State's second-stage case presented a picture of Malone as a man whose life was spiraling out of control due to his increasing drug abuse, loss of lawful employment, involvement in methamphetamine production and related criminal activity, and his determination not to be apprehended for his crimes, resorting to violence as needed. All of this evidence, along with his actions while incarcerated after the murder, was certainly relevant to the jury's determination of whether Malone posed a "continuing threat" of future violence. Malone's complaints about the referenced evidence relate to the weight to be afforded this evidence, not its admissibility. Hence this claim is rejected entirely.

¶ 85 In Proposition VIII, Malone challenges the admission into evidence of a framed portrait of Nik Green, dressed in his highway patrol uniform. This picture was admitted during the second stage, under the authority of 12 O.S.Supp.2003, § 2403, which provides that an "appropriate photograph of the victim while still alive shall be admissible evidence ... to show the general appearance and condition of the victim while alive." [159] Malone maintains that such evidence is patently irrelevant and unfairly prejudicial and that Oklahoma's revised statute allowing it is unconstitutional. Malone acknowledges that this Court has recently rejected the challenge he raises.[160] We decline to revisit this issue here.

¶ 86 In *Payne v. Tennessee*,[161] the United States Supreme Court ruled that it was not necessarily unconstitutional, in the context of the second stage of a capital trial, to allow the State to put on victim impact evidence to provide the jury a "quick glimpse" of the life of the victim, in order to balance out the vast array of mitigating evidence that the defendant is constitutionally entitled to present.[162] This Court notes that a capital defendant is allowed to appear before the jury in "cleaned up" fashion—calm, well-groomed, and dressed in appropriate courtroom attire—usually looking quite different than he or she did at the time of the crime.[163] We find that in capital cases, in

156. *See, e.g., Walker v. State,* 1994 OK CR 66, ¶ 66, 887 P.2d 301, 320 (rejecting vagueness and overbreadth challenges to continuing threat aggravator, as well as challenges to its application); *Malone v. State,* 1994 OK CR 43, ¶ 27, 876 P.2d 707, 715–16 (listing cases rejecting constitutional challenges to continuing threat aggravator); *VanWoundenberg v. State,* 1986 OK CR 81, ¶ 25, 720 P.2d 328, 336–37 (finding aggravator to be "specific and readily understandable" and not requiring further definition). The United States Supreme Court has likewise recognized that "the likelihood of a defendant's committing further crimes is a constitutionally acceptable criterion for imposing the death penalty." *See Barefoot v. Estelle,* 463 U.S. 880, 896, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983).

157. We likewise decline to address Malone's derivative (and waived) challenge to Oklahoma's uniform jury instructions regarding this same aggravator.

158. *See Dunkle v. State,* 2006 OK CR 29, ¶ 41, 139 P.3d 228, 242.

159. *See* 12 O.S.Supp.2003, § 2403.

160. *See Hogan v. State,* 2006 OK CR 19, ¶¶ 62–64, 139 P.3d 907, 930–31; *see also Marquez–Burrola,* 2007 OK CR 14, ¶¶ 30–31, 157 P.3d 749, 760 (addressing constitutional challenge to amended § 2403 and noting that its constitutionality does not depend upon the political motives of the legislators who voted for it).

161. 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

162. *Id.* at 822, 111 S.Ct. at 2607; *see also id.* at 832, 111 S.Ct. at 2612 (O'Connor, J., concurring) (" 'Murder is the ultimate act of depersonalization.' It transforms a living person with hopes, dreams, and fears into a corpse, thereby taking away all that is special and unique about that person. The Constitution does not preclude a State from deciding to give some of that back.") (internal citation omitted).

163. The prosecutor pointed out this phenomenon during his second-stage closing argument, when he stated as follows: "The individual you're setting on has a very dark, cold side. Nik Green saw that side. You've seen him at his very best.

particular, it is constitutional to allow the sentencing jury an actual "quick glimpse" of the person who later became the victim in the case—before he or she was reduced to the corpse shown in crime scene photographs—through the admission of an "appropriate photograph of the victim while still alive."

¶ 87 In Proposition IX, Malone challenges Oklahoma's uniform jury instruction defining "mitigating circumstances," which was included in the second-stage jury instructions used at his trial.[164] Malone asserts that this instruction unconstitutionally limits consideration of evidence that may support a sentence less than death, by excluding consideration of evidence about such things as the defendant's previous law-abiding lifestyle, loving family, and heroic deeds.[165] This Court finds that Oklahoma's uniform instruction defining "mitigating circumstances" is broad and open-ended. It specifically notes that "the determination of what circumstances are mitigating" is up to the jury "to resolve under the facts and circumstances of this case" and that individual jurors do not have to agree upon this determination.[166] We have previously rejected comparable challenges to the constitutionality of this aggravator.[167] We see no reason to depart from these authorities.

¶ 88 In Proposition X, Malone alleges that he received ineffective assistance of counsel in both stages of his trial. In order to establish such a claim, Malone must demonstrate that the performance of his counsel

was deficient and unreasonable and that he was prejudiced thereby.[168] We take up his challenges to the two stages of his trial separately.

## A. First–Stage Ineffective Assistance

¶ 89 Regarding the first stage, Malone asserts that his counsel was ineffective for (1) failing to object to improper cross examination by the prosecutor; (2) introducing otherwise inadmissible evidence of prior bad acts during Malone's direct testimony; (3) failing to have Dr. Smith actually meet with Malone until midway through the first stage; and (4) failing to object to the voluntary intoxication jury instructions. In order to establish prejudice in these first-stage claims, Malone must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [169]

¶ 90 Malone's allegation regarding improper cross examination is resolved within Proposition II. Since the cross examinations were largely unobjectionable, defense counsel's failure to object was not deficient performance, nor was Malone prejudiced thereby. Regarding Malone's complaint that his counsel opened the door to otherwise inadmissible testimony (in the first stage) about a domestic incident with his wife and a fight he got into at a party, the record suggests that this strategy may have been reasonable, and we are convinced that Malone was not prejudiced thereby.[170] There is *not*

---

This is the best—best face he can put on for a two-week period. Jailers and others saw the other side of him."

**164.** *See* OUJI–CR(2d) 4–78 ("Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame.").

**165.** Malone did not preserve this claim at trial, however, hence we review it only for plain error.

**166.** *See* OUJI–CR(2d) 4–78 ("[U]nanimous agreement of jurors concerning mitigating circumstances is not required.")

**167.** *See, e.g. Williams v. State*, 2001 OK CR 9, ¶¶ 108–09, 22 P.3d 702, 727–28; *Cummings v. State*, 1998 OK CR 45, ¶ 58, 968 P.2d 821, 838;

*Knighton v. State*, 1996 OK CR 2, ¶¶ 74–76, 912 P.2d 878, 895–96.

**168.** *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389 (2000).

**169.** *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. And a "reasonable probability" in this context "is a probability sufficient to undermine confidence in the outcome." *Id.*

**170.** Although Malone complains that his counsel "opened the door" on this issue, he does not cite anywhere in the record that the State took advantage of this action. The State suggests that defense counsel's strategy was to establish that Malone had previously submitted to authorities when he was arrested, to support Malone's asser-

a reasonable probability that had this evidence been omitted, Malone's jury would have failed to convict him of first-degree murder. The evidence of his guilt was simply overwhelming.

¶ 91 Malone characterizes his second claim as a "lack of preparation" allegation; yet the only tenable example of ineffective assistance in this regard is defense counsel's failure to meet with Malone's expert witness, Dr. Smith, until midway through the first stage of his trial.[171] This Court does not hesitate to conclude that it is unreasonable and deficient performance for attorneys who are defending a case in which the only plausible defense to first-degree murder involves drug use that impaired the defendant's mental processes—where the fact that the defendant killed the victim is established by overwhelming evidence—to fail to arrange a meeting between the defendant and his chosen expert until the defendant's murder trial is well underway. This certainly does not exemplify diligent trial preparation; and the resulting mid-trial switch of defense theory made the State's task of discrediting Malone's expert witness that much easier.[172]

¶ 92 Once again, however, Malone cannot show prejudice, since he cannot demonstrate a reasonable probability that his jury would have rejected the murder charge against him if he had met with Smith earlier. Malone argues that if his attorneys "had not waited until the middle of trial to have their client evaluated by their expert, the true facts of Appellant's memory of events would have come out much sooner."[173] Yet the "true facts" of Malone's memory did come out at trial—just as Malone's memory of what occurred came out the day of the murder, when he accurately described to his friends what happened and what he did. In the current case, it would not have mattered how defense counsel attempted to "contextualize" Malone's mental state. The State's evidence that Malone willfully, knowingly, and deliberately shot Trooper Green, with the intent to kill him, was simply too compelling. Hence even though counsel's failure to arrange a timely (pre-trial) meeting between Malone and his intended expert made impeachment of this witness that much easier for the State, the *result* of the first stage of Malone's trial was not affected thereby. Malone would still have been convicted of the first-degree murder of Green.

¶ 93 Regarding the voluntary intoxication jury instructions, this Court has thoroughly addressed this issue in Proposition I; and the failure of defense counsel to ensure that Malone's jury was accurately and compre-

tion that he would have submitted to Trooper Green if he had realized Green was a law enforcement officer. This later exchange between defense counsel and Malone supports this argument:

Q. Had you known it was a highway patrol trooper what would you have done?
A. I would have submitted.
Q. Which you did every other time you were confronted with law enforcement.
A. Yes.

The fact that Malone's *testimony* was unreasonable and unbelievable does not mean that his counsel's attempt to develop a broader case theory around this testimony was unreasonable.

171. Malone also notes, as an example of inadequate preparation, that he prevailed on his change of venue motion because of the failure of his counsel to provide the State with a timely copy of this defense expert's report. *See* note 1 *supra.* Yet Malone can hardly claim he was prejudiced by any incompetence in this regard—whether of his counsel or his expert—because it resulted in the granting of his change of venue motion, which was presumably to his benefit.

172. As Malone acknowledges, however, the trial court did not penalize him for this mid-trial shift in theory. In fact, the trial court granted Malone's request that his jury be instructed upon both voluntary intoxication and insanity—based upon Smith's testimony that methamphetamine intoxication is akin to paranoid schizophrenia—even though Malone had given no notice that he would present an insanity defense. The court's generosity in this regard was wise and prudent.

173. Malone contends that the "true facts" are that he has basic memory of what happened, but that he was essentially insane due to "amphetamine psychosis"; hence he was not perceiving reality accurately. Malone maintains that if he had met with his expert sooner, his attorneys would have earlier learned that he was *lying* to them about his lack of memory; hence they could have better pursued an insanity theory (by securing more experts, arguing one coherent theory at trial, *etc.*). This Court has grave doubts about whether a defendant can ever establish ineffective assistance based upon defense counsel's failure to more timely discover that the defendant is lying to that same counsel, *i.e.*, that the defendant is lying to his or her own attorney(s).

hensibly instructed on his theory of defense, *i.e.*, drug-induced intoxication, does suggest deficient and unreasonable performance in this regard. Nevertheless, just as we concluded in Proposition I that the instructional errors in this regard were harmless beyond a reasonable doubt, we likewise conclude that Malone could not have been prejudiced thereby.

## B. Second–Stage Ineffective Assistance

¶ 94 Regarding the second stage of his trial, Malone initially argues that his counsel was ineffective in relation to three claims developed elsewhere in his brief, *i.e.*, failing to object to improper victim impact evidence (Proposition III), a live photograph of the victim (Proposition VIII), and the State's improper second-stage closing argument (Proposition XI). This Court fully addressed Malone's victim impact challenges in Proposition III. Based upon this analysis, we further conclude that defense counsel's performance in regard to the victim impact evidence presented in this case was both deficient and unreasonable and that Malone was prejudiced thereby. Just as we could not confidently conclude that the presentation of this improper victim impact evidence, particularly Mrs. Green's sentencing plea, was harmless, we find that the inclusion of this evidence does undermine our confidence in the death penalty verdict in this case. Regarding the live photograph, our rejection of Malone's

Proposition VIII claim compels our rejection of this derivative claim. And regarding the State's final closing argument, we will address Malone's ineffective assistance claim after addressing this argument in Proposition XI.

¶ 95 Malone also raises three independent second-stage ineffective assistance claims: (1) failure to "marshal the evidence" with a strong closing argument; (2) failure to utilize available expert testimony to counter the State's "continuing threat" evidence; and (3) failure to adequately investigate and present available mitigating evidence. On July 10, 2006, Malone filed an Application for Evidentiary Hearing on Sixth Amendment Claims, seeking an evidentiary hearing and the opportunity to supplement the record with new evidence in support of his second and third claims herein. We have reviewed this Application and the attached affidavits.

¶ 96 Malone challenges numerous aspects of defense counsel's second-stage closing argument and suggests various ways it could have been better. He notes that defense counsel began by conceding the aggravators.[174] In fact, defense counsel also began his opening statement in this stage of the trial by conceding the applicability of at least some of the aggravators.[175] This Court finds counsel's strategic decision not to contest the "avoid arrest" and "peace officer victim" ag-

---

174. After acknowledging the trial court, the prosecutor, and the jury, defense counsel began:

> This is the last time that anyone will speak for Ricky Malone. In essence, I am the last voice on his behalf, which is, quite frankly, a pretty heavy burden to bear.
>
> I'm going to come to you and ask you, unlike Mr. Schulte, to consider something less than death. You have already, by your verdict on Tuesday, in—found that my client has committed murder and that the murder was premeditated.
>
> And let's just cut to the chase: With those aggravating circumstances there's no question—I mean, your verdict said that he killed a highway patrolman in the performance of his duty. That is a given. I'm not going to stand here and argue that that aggravator isn't present. I'm not going to stand here and argue that the second one of murder to prevent arrest or prosecution isn't present. Of course it is. There isn't any question. You could check that now.

> But there's more to this case than that. There is more to this case than just the fact that there are at least two—I mean, the third aggravator—what does it matter in the greater scheme of things so far as the legal ramifications go?

175. Defense counsel began his second-stage opening statement as follows:

> Ladies and gentlemen of the jury, this—this phase of the case is obviously the hardest. The issue is what kind of penalty you're going to assess against Rick Malone.
>
> Obviously, you have, by your verdict, found that he is guilty. Obviously, the aggravating circumstances that are necessary to assess the death penalty by your verdict have been—have been found. So the only issue in this case is Ricky Malone and the only issue is what kind of punishment will you assess.

gravating circumstances entirely reasonable.[176]

¶ 97 Whether defense counsel ever really "concedes" the continuing threat aggravator is unclear, since his closing argument reference to it seems more to indicate that this aggravator does not really "matter in the greater scheme of things."[177] It is clear, however, that defense counsel never argues that this aggravator does not apply. Malone suggests a number of ways that defense counsel could have contested this aggravator and challenged the evidence presented by the State in support of it. This Court does not think such arguments would have been helpful, in light of the vast amount of evidence presented by the State to support this aggravator.[178] We do agree, however, that defense counsel's second-stage remarks to Malone's jury were brief, tepid, reserved, and virtually resigned.[179] The most emotional part of defense counsel's closing remarks was when he recounted Malone's "downward spiral into the abyss," after he got addicted to methamphetamine in 2002—a disturbing story that the State had already effectively conveyed to the jury.[180] And although counsel concluded by attempting to reassure the jury that Malone would never be out of prison, he failed to provide the jury with any significant reason to spare Malone's life and failed even to directly ask the jury to do so.[181]

¶ 98 We do not question the reasonableness of defense counsel's overall second-stage strategy of attempting to get the jury to look beyond Trooper Green's murder and the other "bad acts" committed by Malone in the time period surrounding the murder, to consider the potential value of Malone's life as a whole, and in particular, his life before methamphetamine. This strategy was evident in his opening statement, his closing argument, and in his questioning of the two witnesses he presented. And it was a very reasonable strategy. The problem, as outlined further below, is that the mitigating evidence discovered and presented by defense counsel at trial about Malone's life "pre-meth" was very limited and not particularly noteworthy or compelling.

■■■ ¶ 99 Before moving to consider Malone's claim that his counsel did not adequately discover and present available mitigating evidence, we briefly address his claim that his counsel failed to utilize available expert testimony to counter the State's "continuing threat" evidence. Malone maintains that his counsel should have presented statistical evidence to counter the State's evidence about his future dangerousness. Support for this claim is contained within *Claim Two of Malone's Application for Evidentiary Hearing* ("Application") and the Exhibit X documents attached thereto.[182]

176. It is somewhat surprising, however, that defense counsel would begin the second stage by suggesting that the aggravators necessary to execute Malone already "have been found," which appears to minimize the jury's fact-finding responsibilities in the second stage.

177. This too seems a rather strange suggestion, since whether a defendant remains "a continuing threat" of future violent acts would seem, almost inevitably, to be a highly significant question for jurors attempting to decide whether or not to sentence that individual to death.

178. In fact, Malone's brief "acknowledges that there simply was no defense to these aggravators."

179. In addition to conceding aggravators, defense counsel failed to make any argument countering the State's claim that the aggravating circumstances in the case exceed the mitigating evidence presented. In fact, shortly after suggesting in his opening statement that "our lives are not defined by a single act," and that the

rotten things Malone did all occurred in a two-year period, defense counsel appeared almost to concede the inevitability of a death sentence. He stated, "But before you decide that you're going to kill Ricky Malone or have him executed, you need to look at all of his life, not just the very narrow window that the District Attorney is going to present."

180. Defense counsel noted that "just 18 months before . . . [Malone] was a productive, fun-going, caring person, who has now become a paranoid, hallucinating person who would shoot another human being."

181. Defense counsel's final remarks were as follows: "The bottom line is that Ricky Malone will die in prison. He will die in prison. And the only decision that you'll make is who will determine the day, the year, the month. Will you make that determination, or will you let God."

182. Although the claim is labeled "Claim Three" in Malone's application, there are only two claims; and this is the second one.

¶ 100 Malone suggests that his counsel should have sought out and presented a "risk assessment" regarding his future dangerousness, comparable to Exhibit X–2, which was prepared by Psychologist J. Randall Price.[183] Malone presents an extensive argument in his Application about the value and reliability of such an assessment, which is based upon a clinical interview, various psychological tests, and an actuarial methodology. We need not decide whether defense counsel's performance was deficient for failing to pursue and present such an assessment. In the context of Malone's case, where the State presented substantial and frightening evidence about Malone's behavior while incarcerated—indicating a determination to escape through whatever means necessary—this Court is convinced that the jury would not have been swayed or moved by the statistical analysis of Price's report. Hence we conclude that Malone cannot show prejudice and has failed to establish that he should be granted an evidentiary hearing in this regard.[184] Consequently, we reject this claim and here DENY CLAIM TWO OF MALONE'S APPLICATION FOR AN EVIDENTIARY HEARING.

¶ 101 Malone's final claim of second-stage ineffective assistance is that defense counsel failed to adequately investigate and present available mitigating evidence. Support for this claim is contained within *Claim One of Malone's Application for Evidentiary Hearing* and Exhibits A through W and Y, attached thereto. This application is governed by Rule 3.11(B)(3)(b) of this Court's Rules, which deals specifically with evidentiary hearing requests based upon a claim of ineffective assistance for failure to adequately investigate and develop evidence.[185] Under this Rule, Malone is entitled to an evidentiary hearing only if his application and attached affidavits "contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." [186]

¶ 102 Both the Supreme Court and this Court have recognized the importance and potential impact of mitigating evidence in the sentencing stage of a capital trial.[187] Evidence about a capital defendant's background and life prior to his crime can affect the jury's determination of whether the aggravating circumstances outweigh the mitigating circumstances in the case, as well as its decision about whether to impose the death penalty on a defendant who is "death-eligible." [188] Hence both the Supreme Court and this Court have reversed capital sentences based upon trial counsel's failure to develop and present available mitigating evidence.[189]

183. At the end of his nine-page report, Dr. Price concludes that Malone "represents a minimal risk for violence if incarcerated and a mild-to-moderate risk if released into the free world."

184. *See* Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2006) (quoted *infra* in text).

185. *Id.;* see *also Taylor v. State*, 1998 OK CR 64, 972 P.2d 864 (discussing and applying rule).

186. *See* Rule 3.11(B)(3)(b)(i).

187. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 393, 120 S.Ct. 1495, 1513, 146 L.Ed.2d 389 (2000) ("[I]t is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer."); *Warner v. State*, 2001 OK CR 11, ¶ 15, 29 P.3d 569, 575 ("It is beyond dispute that mitigating evidence is critical to the sentencer in a capital case."); *Wallace v. State*, 1995 OK CR 19, ¶ 12, 893 P.2d 504, 510 ("It is beyond question mitigating evidence is critical to the sentencer in a capital case.") (citations omitted).

188. *See Williams*, 529 U.S. at 398, 120 S.Ct. at 1516 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Marquez–Burrola v. State*, 2007 OK CR 14, ¶ 46, 157 P.3d 749, 764 ("[M]itigation evidence can, quite literally, make the difference between life and death in a capital case.").

189. *See Williams*, 529 U.S. at 398–99, 120 S.Ct. at 1516; *Wiggins v. Smith*, 539 U.S. 510, 538, 123 S.Ct. 2527, 2544, 156 L.Ed.2d 471 (2003); *Rompilla v. Beard*, 545 U.S. 374, 393, 125 S.Ct. 2456, 2469, 162 L.Ed.2d 360 (2005); *Marquez–Burrola*, 2007 OK CR 14, ¶ 62, 157 P.3d at 768; *Warner*, 2001 OK CR 11, ¶¶ 14–18, 29 P.3d at 574–75; *cf. Garrison v. State*, 2004 OK CR 35, ¶¶ 168–69, 103 P.3d 590, 619–20 (reversing death sentence based upon appellate ineffective assistance, for failure to adequately present seemingly meritorious claim of ineffective assis-

¶ 103 The crucial importance of mitigating evidence during the second stage of a capital trial imposes upon capital defense counsel a corresponding duty to investigate a defendant's background and develop potential mitigating evidence.[190] While this obligation is not unlimited, and an attorney is entitled to make reasonable strategic decisions about which leads to investigate and how far to pursue them, strategic decisions made after an incomplete investigation are evaluated according to the reasonableness of the attorney's decision to limit the investigation, under all the circumstances of the case.[191] Although defense counsel is entitled to make strategic decisions about what mitigating evidence to focus upon, decisions made without adequate investigation of potential mitigating evidence cannot be justified by merely invoking the mantra of "strategy."[192]

¶ 104 The affidavits attached to Malone's Application suggest that his trial attorneys chose to present a very limited mitigation case—just Malone's one sister (Tammy Sturdevant) and his wife (Colleen Malone)—without fully investigating what other mitigation evidence and witnesses were available.[193] And according to the affidavit of Sturdevant, she barely met with Malone's counsel and was not given adequate time to consider or prepare for her second-stage testimony.[194] Similarly, an affidavit from Malone's maternal aunt states that she talked to an investigator for his attorneys the summer after the crime and that she made a list for him of people who knew Malone. She told the investigator that she did not know the names of the men Malone worked with at the fire department, but that the fire captain could provide those names.[195] Yet of the nine co-worker affidavits attached to Malone's Application, eight state that the affiant was not contacted by defense counsel and that the affiant would have testified for Malone if asked to do so.[196] And retired firefighter

---

tance of trial counsel regarding second-stage mitigation case).

**190.** See *Williams*, 529 U.S. at 396, 120 S.Ct. at 1515 (noting capital defense counsel's "obligation to conduct a thorough investigation of the defendant's background").

**191.** *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066; *see also Wiggins*, 539 U.S. at 527, 123 S.Ct. at 2538 ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Marquez–Burrola*, 2007 OK CR 14, ¶ 54, 157 P.3d at 766 ("[C]ounsel's decisions about the nature and quantity of mitigating evidence must be based on reasonable professional judgment, which requires experience, training, and some basic research into what evidence is available and how it might make a difference.").

**192.** *See id.* at ¶ 54, 157 P.3d at 766 ("The amount of deference given to counsel's strategic decisions depends on the amount of investigation that went into them") (citing *Strickland*); *Wiggins*, 539 U.S. at 526–27, 123 S.Ct. at 2538 (contrasting "strategic decision" to limit pursuit of mitigating evidence with "*post-hoc* rationalization of counsel's conduct") (emphasis in original).

**193.** *Cf. id.* at 524, 123 S.Ct. at 2537 (criticizing defense counsel who "abandoned their investigation of petitioner's background after having ac-quired only rudimentary knowledge of his history from a narrow set of sources").

**194.** Sturdevant states that she only spoke to Malone's attorneys twice, once before she testified for the State in the first stage and once just before testifying in the second stage. She adds:

> Right before I testified for the Defense, Mr. Gutteridge told me to tell him about my brother and our childhood. He said to just tell the good points about my brother from childhood to the day this happened. I didn't have time to think about it and get myself together. Mr. Gutteridge spent about 10 to 15 minutes with me each time he talked to me.

See Affidavit of Tammy Sturdevant, Exhibit W.

**195.** *See* Affidavit of Martha King, Exhibit Y. King also states that she told Malone's attorney that she would testify as a character witness, but that the attorney said "no," "because he was going to use Rick's sister Tammy and Rick's wife Colleen." *Id.*

**196.** *See* Affidavit of Cathy Lehew, Exhibit J (EMS co-worker); Affidavit of Jeff Lehew, Exhibit K (EMS and fire department co-worker); Affidavit of Dewayne Kaspereit, Exhibit M (fire department co-worker); Affidavit of Greg Wortham, Exhibit N (fire department co-worker); Affidavit of Johnny Owens, Exhibit O (fire department co-worker); Affidavit of Gary Wainscott, Exhibit P (fire department co-worker); Affidavit of Phil Stidham, Exhibit Q (EMS co-worker); Affidavit of Teresa D. "Reese" Marshall, Exhibit V (ER nurse). The only co-worker affidavit that does

Dewayne Kaspereit indicates that he actually called Malone's trial attorney to offer to testify, but that the attorney never returned his call.[197] Malone's ex-wife, Beth Malone, also states that she was never contacted, but that she would have testified if asked to do so.[198] And ten other affidavits attached to Malone's Application, from friends and family members, including his two other sisters, also state that these affiants would have testified if they had been asked to do so.[199] In fact Malone's other sisters, who are twins and who were mentioned at his trial, apparently attended the entire trial, just in case they were needed, but defense counsel never spoke to them.[200]

¶ 105 The affidavits attached to Malone's Application strongly suggest that his attorneys unreasonably limited their investigation into the potential mitigating evidence in his case and that they did not conduct a thorough, thoughtful mitigation investigation.[201] This Court finds the failure of Malone's attorneys to find and offer testimony from *any* of his former co-workers particularly troubling, since defense counsel knew Malone had a substantial work history as a paramedic and a firefighter—both of which are demanding fields that are devoted to serving other people. In light of the many potential witnesses brought forward through Malone's Application, it seems likely that a reasonable effort would have resulted in finding at least a few co-workers who would have testified on Malone's behalf. The testimony of such witnesses seems a rather obvious and necessary supplement to the testimony of Malone's sister and wife—since both of these witnesses were related to him, and both were known to have already lied on his behalf in connection with his case.[202] As we recently noted in

not make these assertions is that of Darrel Meadows. *See* Affidavit of Darrel Meadows, Exhibit L (fire department co-worker). Meadows does not address whether he was contacted by defense counsel or not.

197. *See* Affidavit of Dewayne Kaspereit, Exhibit M. Kaspereit states that Don Gutteridge was the attorney for whom he left the message. The fact that Kaspereit was willing to testify for Malone at all is noteworthy, since when Malone's methamphetamine was found at the fire station, he initially attempted to implicate Kaspereit, stating that the drugs probably belonged to him.

198. *See* Affidavit of Mary Beth Malone, Exhibit C. The identity of Beth Malone was known to both defense counsel and Malone's jury, since she was referred to in both stages of his trial in regard to a "domestic disturbance" at their home and their subsequent divorce.

199. *See* Affidavit of Donna Childers, Exhibit A (paternal aunt); Affidavit of Katy Landrum, Exhibit B (sister); Affidavit of Ricky Brad Malone, Exhibit D (adopted son); Affidavit of Rick Malone Senior, Exhibit E (father); Affidavit of Kenneth Vaughn, Exhibit F (brother-in-law); Affidavit of Kristy Vaughn, Exhibit G (sister); Affidavit of Calvin Townley, Exhibit H (stepfather); Affidavit of Harold Childers, Exhibit I (grandfather); Affidavit of Ron Mulkey, Exhibit T (pastor); Affidavit of Sally Yearicks, Exhibit U (cousin of Beth Malone). Two other attached affidavits do not contain a specific statement about willingness to testify, but their content strongly suggests a desire to help Malone, whom the affiants knew, admired, and appreciated in better times. *See* Affidavit of Susan Evans, Exhibit R (friend and employer); Affidavit of Dale Harris, Exhibit S (coach and teacher).

200. *See* Affidavit of Katy Landrum, Exhibit B ("Rick's wife Colleen Malone asked my twin sister Kristy and me to attend the whole trial just in case Rick's lawyer needed to put us on the stand. We were at the trial the whole time, but Rick's attorney never talked to us.").

201. *Cf. Wiggins*, 539 U.S. at 526, 123 S.Ct. at 2537 (noting record suggests that defense counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *Marquez–Burrola*, 2007 OK CR 14, ¶ 54, 157 P.3d at 766 ("[C]ounsel's brief, eleventh-hour discussion with Appellant's parents and sister about testifying in the punishment stage ... surely does not begin to approach a true mitigation investigation.").

202. Defense counsel's decision to rely only on these two witnesses is particularly surprising, since counsel was (or should have been) well aware of their vulnerabilities and limited value as witnesses. Defense counsel knew that Sturdevant was the one who introduced Malone to methamphetamine, that she was one of his drug-making cohorts, that she did what she could to help Malone avoid being caught for killing Green, and that she later told numerous lies on his behalf, in a continuing effort to help her brother avoid conviction for his crime—including under oath at his preliminary hearing. And defense counsel had to know that Malone's jury would learn all of these things as well.

And while Colleen Malone did not have quite so many vulnerabilities as a witness, she had only been married to Malone for two years and had only known him for six months when they got married. In fact, it wasn't clear from her

*Marquez–Burrola v. State*, there is a *"quali-tative* difference between having a family member generally ask the jury to spare the life of the defendant, and having third parties offer the jury *more objective and specific* examples of *why* the defendant's life should be spared." [203] While jurors may question the objectivity of testimony from a defen-dant's sister and wife (particularly this sister and this wife), "they may give different treat-ment, and perhaps greater weight, to the testimony of less biased witnesses which illu-minates the man whose life is in their hands." [204]

¶ 106 The affidavits offered by Malone sug-gest that there exists a significant amount of powerful, varied, unbiased, and potentially result-altering mitigating evidence that could have been discovered and presented at his trial. Former co-workers of Malone describe him as follows. "He was very caring to the patients," particularly "elderly patients," who "loved Rick." [205] "Rick was a caring person and a dedicated person—always," and he treated all his patients "with the utmost re-spect." [206] "Rick had one of the best bedside manners I have ever seen" and "always treated the people real nice." [207] He was "a skilled paramedic," who did "[w]hatever needed to be done or was asked of him." [208] He was "a good guy," and what happened was "way out of character"; "[e]veryone at the fire department said if anything hap-pened to you, we sure wish Rick would be the one to answer the emergency call and . . . be the one to work on you." [209] "[Y]ou couldn't ask for a nicer person"; Rick "treat-ed everybody well," "worked all the time . . . [and] was burning the candle at both ends." [210] He was "a good guy," who "knew what he was doing" and "worked all the time to take care of his kids." [211] Malone was "a good man" and "a faithful husband." [212] One nurse, who worked in the emergency room and knew Malone from his work in the ambu-lance service, described him as "the young, strong and energetic one in the group," who "never hesitated to make himself available if needed." [213]

testimony that she ever knew him very well. She testified that she did not know that he was termi-nated from the fire department in September of 2003, or that he was subsequently fired from the ambulance service, and that she did not learn that he had lost these jobs until "much later." She testified that Malone "seemed depressed" and got "real distant" in the fall of 2003, and that "he was always just away from me." Al-though they lived in the same home, and Colleen admitted knowing that her husband was buying guns and putting up surveillance equipment, she denied having any knowledge that he was using or making methamphetamine—despite Malone's testimony that he was using heavily during this time and the vast array of materials associated with manufacturing this drug that were found in their home and garage (and put into evidence by the State during the second stage). In fact, de-fense counsel acknowledged in his second-stage opening that Colleen Malone would "say that she didn't know, but she did know what was going on." She did admit to initially providing police false information regarding her husband's whereabouts on the morning of the murder, ex-plaining that Malone asked her to do so and that she didn't know "the severity" of what was at stake.

Overall, the testimony of Colleen Malone, wife of a man whose life was on the line, appears to have been surprisingly anemic. Her descriptions of her husband's personality were rather cryp-tic—"real funny," "[r]eal sweet," "always hap-py"—and while she said Malone was a "good father" to their son (born in December of 2002),

her only example of this was that Malone was "always taking care of him, you know." In fact, although Colleen Malone testified that she would continue to visit Malone in jail, because he was her husband and she loved him, she concluded her testimony without ever even asking the jury to spare his life.

203. 2007 OK CR 14, ¶ 55, 157 P.3d at 766 (em-phasis in original).

204. *Id.* at ¶ 55, 157 P.3d at 767.

205. Affidavit of Cathey Lehew, Exhibit J.

206. Affidavit of Jeff Lehew, Exhibit K.

207. Affidavit of Darrel Meadows, Exhibit L.

208. Affidavit of Dewayne Kaspereit, Exhibit M.

209. Affidavit of Greg Wortham, Exhibit N.

210. Affidavit of Johnny Owens, Exhibit O.

211. Affidavit of Gary Wainscott, Exhibit P.

212. Affidavit of Phil Stidham, Exhibit Q.

213. Affidavit of Teresa D. "Reese" Marshall, Ex-hibit V. Marshall also recalls Malone "resting his head on the counter, totally exhausted after doing CPR on a patient until it was no longer

¶ 107 Most of Malone's former co-workers also refer to a very public affair that his ex-wife, Beth Malone, had with an assistant fire chief at the fire department. Kaspereit's affidavit describes Malone as "a good, honest, dependable, gullible kid," until the time when "one of the shift supervisors was having an affair with Rick's wife while on-duty and throwing it in his face." Kaspereit states, "Rick went to the Fire Chief about it, and he told Rick to leave it alone. It was thrown in his face every day." Kaspereit traces Malone's decline to the experience of this humiliating affair, after which Malone "went downhill," "slipping into depression," and also "taking meth."[214] Various co-workers likewise note how humiliating the affair was for Malone and how much it affected him.[215] Other affidavits echo the testimony presented at trial about how the subsequent death of his mother impacted his decline into depression and drug use.[216] Many co-workers express regret about not recognizing signs of methamphetamine use in Malone.[217]

¶ 108 Perhaps the most surprising affidavit offered by Malone with his Application is that of his ex-wife, Beth Malone. Despite the negative information about their marriage that came out at trial, Beth offers a substantial and very positive portrayal of her ex-husband, whom she "never stopped loving."[218] She describes their early relationship and how they married in May of 1992.[219] Malone then adopted her three children: eight-year-old Randy, five-year-old Amanda, and the youngest, who was two, and who they renamed Ricky Bradford Malone, after his new father. She states that Malone started going to EMT school to be a paramedic and encouraged her to do the same. Malone then encouraged her to go to college and get her R.N., which she did.[220] Beth describes how they would alternate 24–hour shifts, "so that one of us could always be home with the children," and how Malone helped the kids with their homework.[221] Malone's role as a father to these children was never even mentioned at his trial.[222]

¶ 109 Beth Malone admits that she got involved with a firefighter who worked with Malone and that she started seeing him publicly while she was still married to Malone. Beth addresses the "domestic incident" and states that it arose from an argument about Malone's jealousy regarding this other firefighter. While Beth's depiction of what happened at their home that day may be somewhat dubious, her statements certainly place

needed—drained physically, emotionally and drenched in sweat."

214. Affidavit of Dewayne Kaspereit, Exhibit M. Kaspereit notes that he does not "condone what Rick did because I knew Nikky Green. But I believe Rick wasn't in his right mind."

215. See, e.g., Affidavit of Cathey Lehew, Exhibit J ("There was really a change in Rick when it came out that Beth was seeing the assistant fire chief.... I think he was embarrassed and humiliated. This went on for quite awhile."); Affidavit of Martha King, Exhibit Y ("Rick and his wife Mary Beth divorced in about 2000, and his mother passed away in April 2002. Rick took both losses very hard.").

216. See, e.g., id.; Affidavit of Donna Childers, Exhibit A ("I think some of Rick's breaking point was when his mom passed away."); Affidavit of Katy Landrum, Exhibit B ("I noticed Rick changing about six months to a year after our mom passed away.").

217. See, e.g., Affidavit of Darrel Meadows, Exhibit L ("When drugs were found at the fire station, most of us thought it was some other guy. After the murder happened, we took a series of courses about what to look for with meth addiction in a co-worker.").

218. See Affidavit of Beth Malone, Exhibit C.

219. Beth, who is over seven years older than Malone, notes that she initially thought Malone was too young for her. Id. They got married the day after Malone graduated from high school. See Affidavit of Martha King, Exhibit Y. Malone was 17 years old at the time.

220. See Affidavit of Beth Malone, Exhibit C ("Now I am a nurse supervisor at ICU at Duncan Regional Hospital. I wouldn't have done this if Ricky hadn't pushed me and supported me.").

221. Id.

222. Other affidavits also attest to Malone's fatherly commitment to these children. See Affidavit of Donna Childers, Exhibit A (noting that Malone did various "typical 'dad' things with his children" and that "[h]e loved those kids and those kids loved him"); Affidavit of Sally Yearicks, Exhibit U ("He was so good with the kids. Rick came to family get-togethers and participated in the stuff the kids had at school."); see also Affidavit of Johnny Owens, Exhibit O ("He loved

the incident in a different light.[223] Beth also acknowledges the pain and humiliation her affair caused Malone.[224] This affair and its impact on Malone were never mentioned at his trial. Beth also describes Malone's descent into drug use, starting with steroids, then Lortabs after a football injury, and later methamphetamine, which was consistent with Malone's trial testimony.[225]

¶ 110 Beth Malone was also a former co-worker of Malone's, since they both worked as paramedics for the same ambulance service. In this regard, Beth attests to an incident involving an elderly woman who was choking. When Malone heard on the radio that Beth and her partner were having trouble helping the woman, he came to the scene to help, administered the Heimlich maneuver, dislodged the meat in the woman's throat, "and saved her life."[226] Other witnesses offer similar testimony about Malone helping people and even saving lives.[227] Ca-

thy Lehew states that she "would have liked to ask the jury to take into consideration all the lives Rick saved and the sacrifices he made being called out in the middle of the night and taking care of people at some of the worst points in their lives."[228] Reese Marshall adds, "I know that Rick took a life while under the influence of a horrible mind-altering drug, but in his short lifetime, Rick [also] saved and cared for many lives."[229]

¶ 111 This Court has focused mostly upon the affidavits of Malone's former co-workers, since these persons may well have had the most potential as mitigation witnesses in the current case. A number of affidavits note the prominence of partying and drug use within Malone's family and that his family was not necessarily a very good influence on his life.[230] Nevertheless, Malone's twin sisters and other relatives could have provided valuable information about his early life and

. his kids. He worked hard to take care of them.").

223. Beth states that when the police came, Malone was "hugging me but the police thought he was attacking me." She also states, more credibly, "Ricky didn't hit me[,] but he did hit the wall." Affidavit of Beth Malone, Exhibit C.

224. Beth notes that the guys at the fire department "were teasing him about the fireman and me—he couldn't get away from it. They said rude things about me that were very cruel." Id.

225. Id. Phil Stidham describes Beth contacting him about a week before the crime, saying Malone "was in trouble and I needed to go talk to him." Affidavit of Phil Stidham, Exhibit Q. Malone had been fired from the fire department and ambulance service, "so the other paramedics couldn't associate with him anymore." Id. Stidham states, "Since I wasn't working as a paramedic then, I was trying to find Rick to tell him that we still cared about him and we wanted to help him." Id.

226. See Affidavit of Beth Malone, Exhibit C.

227. Another co-worker/friend describes being at a beach with Rick and Beth Malone when a Mexican man was pulled from the water, not breathing. She states, "Rick and Beth started CPR and did it until the ambulance got there. Rick didn't hesitate to help that man even though it meant mouth-to-mouth resuscitation with no protection." See Affidavit of Cathey Lehew, Exhibit J. Such testimony would have been a help-

ful counter at trial to Malone's incident with the Mexican man at the party.

228. Id.

229. Affidavit of Teresa D. "Reese" Marshall, Exhibit V.

230. The words of co-worker Phil Stidham are particularly powerful in this regard:
 Rick and I were close and could relate to each other since we were both raised in families that weren't really there for us. We both came from families that were uneducated and without high standards or ambitions for us, but we both got out and became something when we became paramedics. I understood that it was a lot for Rick to escape to become even a paramedic. . . . When I heard he was hanging out with his relatives again, I was worried that his loyalty to his family would pull him down.
See Affidavit of Phil Stidham, Exhibit Q; see also Affidavit of Beth Malone, Exhibit C ("Ricky wouldn't go see his family on holidays because of the drinking and partying. He never did that. He is the only one in his family that graduated from high school, and he's the only one who started college. His twin sisters dropped out . . . in the ninth grade."). All three of Malone's sisters acknowledge being addicted to methamphetamine, although they state that since the shooting, they have stopped using. Sturdevant testified to this at trial and admitted she was the one who first gave Malone methamphetamine. See also Affidavit of Katy Landrum, Exhibit B ("I was doing meth since I was 13 years-old."); but see Affidavit of Kristy Vaughn, Exhibit G (indicating Malone and his sisters all "got hooked on

positive character traits.[231] They also could have provided specific examples of how using methamphetamine changed his personality entirely.[232]

¶ 112 Claims of ineffective assistance for failure to adequately investigate and present mitigating evidence are treated in essentially the same manner as other ineffective assistance claims, requiring a showing of both deficient attorney performance and prejudice.[233] The main difference is in the prejudice analysis, where the reviewing court must determine whether there is a "reasonable probability" that if trial counsel had presented the omitted mitigating evidence, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[234] In making this determination, the newly proffered mitigating evidence must be considered along with the mitigating evidence that was presented and then weighed against the aggravating evidence that was presented.[235] Finally, we also consider whether there is a reasonable probability that inclusion of the omitted mitigating evidence could have "alter[ed] the jury's selection of penalty, even if

it does not undermine or rebut the prosecution's death-eligibility case."[236]

¶ 113 This Court finds that Malone has presented a significant amount of evidence strongly suggesting that the investigation of his trial counsel into potential mitigating evidence was unreasonable and deficient. We recognize, however, that the current state of the record does not contain any direct evidence from Malone's trial attorneys about what they did, how much they did, why they made the choices they did, *etc.* An evidentiary hearing would allow a more direct investigation of this question—though it appears unnecessary in the current case, for the reasons discussed below. This Court further finds that Malone has presented a vast amount of potentially mitigating evidence from a wide range of sources and that such evidence could have been very helpful in "humanizing" Malone.[237]

¶ 114 The State did a thorough job at trial of depicting Malone as a monster; and the facts of this crime, as well as other actions by Malone in the time period surrounding this murder, provided ample material to work with in this regard. Nevertheless, Malone

---

meth ... at the same time," when their mother died).

**231.** *See* Affidavit of Katy Landrum, Exhibit B (explaining Malone's role in the family, including taking care of and buying a home for their mother, and not allowing people to pick on his sisters); Affidavit of Kristy Vaughn, Exhibit G (noting that Malone looked out for his sisters, helped pay for her lawyer so she could seek custody of her son, and "worshipped the ground our mother walked on"); Affidavit of Harold Childers, Exhibit I (grandfather) ("He was a wonderful kid. He never had any problems and never got into trouble or anything like that."). The affidavit of Rick and Beth Malone's fifteen-year-old son states that Malone took him to football games and gymnastics, helped him with sports, and that "[u]p until the time he went to jail, my father would take me with him two or three days a week." Affidavit of Ricky Brad Malone, Exhibit D. Ricky Brad Malone also states that his father was "always real nice to me and never hurt me," that he was "never afraid" of him, and that if he had been asked to testify, he "would have asked the jury to let my father live so that I can still be with him." *Id.* Malone also offers an affidavit from his father, who admits, "I wasn't there for Ricky growing up because I didn't get along with my ex-wife, Ricky's mother." Affidavit of Rick Malone Senior, Exhibit E. Rick also offers affidavits from a former pastor, coach, employer,

*etc.,* all attesting to his positive traits as a youth and young man.

**232.** *See, e.g.,* Affidavit of Calvin Townley, Exhibit H (stepfather) (noting how Malone's personality changed when he started using drugs, that methamphetamine "seemed to rule Ricky's mind," and that "all he could think of was making more meth and making more money").

**233.** *See Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000); *Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**234.** *See Brown v. State,* 1997 OK CR 1, ¶ 15, 933 P.2d 316, 322; *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

**235.** *See Williams,* 529 U.S. at 397–98, 120 S.Ct. at 1515; *Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

**236.** *Williams,* 529 U.S. at 398, 120 S.Ct. at 1516.

**237.** *See Marquez–Burrola,* 2007 OK CR 14, ¶ 53, 157 P.3d at 766 ("One important purpose of mitigation evidence is to humanize the defendant in the eyes of the jury.").

apparently did have a life that was noteworthy, honorable, and admirable prior to his descent into drugs and crime.[238] While his trial counsel attempted to argue this theory at trial, he did not discover or present to Malone's jury the facts to back it up.[239] The affidavits attached to Malone's Application suggest that there is much material that could and should have been presented to the jury that was deciding Malone's fate. Looked at *in toto,* this Court finds there is a reasonable probability that such evidence could have had an impact on the ultimate sentencing determination in this case, by giving the jury—or at least one juror—a reason to spare Malone's life.[240] Hence the failure of Malone's counsel to develop and present this kind of mitigating evidence undermines this Court's confidence in the jury's sentencing verdict in this case.

¶ 115 This Court concludes that Malone's Application for Evidentiary Hearing and the attached affidavits do contain sufficient information to show, by clear and convincing evidence, that there is a strong possibility Malone's trial counsel was ineffective for failing to identify or utilize the proffered evidence.[241] Hence Malone has demonstrated that he is *entitled to an evidentiary hear-* *ing on Claim One of his Application.* In the current case, *however,* this Court need not grant such an evidentiary hearing, and *this claim is rendered moot,* since we can and do choose instead to grant Malone sentencing relief on the claims raised in Proposition III, as well as the other errors discussed herein. We further find that Malone has established that his counsel was constitutionally ineffective due to his failures in connection with the victim impact evidence presented in his case, and that Malone has made a strong case that his counsel was constitutionally ineffective in regard to the second stage of his trial as a whole, for failing to argue vigorously that Malone's life should be spared and, more importantly, for failing to discover and present to his jury available and emotionally significant evidence that Malone's life was worth sparing—because of the kind of person he once was, if for no other reason.

¶ 116 In Proposition XI, Malone argues that the cumulative effect of the prejudicial errors committed in the second stage of his trial, combined with improper prosecutorial argument in the State's final closing remarks, together produced a situation where the jury's decision to sentence him to death was influenced by passion, prejudice, and other arbitrary factors.[242] Malone notes that

---

**238.** *Cf. id.* at ¶ 56, 157 P.3d at 767 ("Most of the mitigating evidence counsel failed to present in this case ... highlighted positive aspects of Appellant's character and background, but it was powerfully mitigating nonetheless.").

**239.** We noted a parallel disparity in *Marquez–Burrola,* in which "the State characterized Appellant as an abusive monster," and "[t]he defense did little to alter this picture." *Id.* at ¶ 58, 157 P.3d at 767. In that case too the crime itself, along with other evidence, supported this harsh characterization. Nevertheless, we recognized on appeal, after an evidentiary hearing in the case, that witnesses who knew the defendant in his earlier life—who were not discovered or contacted until after the defendant's original trial—could have offered "unique and moving vignettes about Appellant's good character." *Id.* at ¶ 52, 157 P.3d at 765. We noted that these stories about the defendant "growing up and doing good things in his rural Mexican community might well have resonated with citizens of a rural Oklahoma county." *Id.* at ¶ 56, 157 P.3d at 767. We find that the comparable, positive stories about Malone that are reflected in the proffered affidavits might well have resonated with his jury as well. In *Marquez–Burrola* we modi-

fied the defendant's sentence to life without parole, without remanding for a resentencing. *Id.* at ¶ 62, 157 P.3d at 768. We take a more conservative path in the current case.

**240.** *See Wiggins,* 539 U.S. at 537, 123 S.Ct. at 2543 (finding prejudice for failure to present more complete mitigation case, noting that if jury had known "petitioner's excruciating life history ..., there is a reasonable probability that at least one juror would have struck a different balance").

**241.** *See* Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006).

**242.** *See* 21 O.S.2001, § 701.13(C)(1) (setting forth this Court's obligation to determine, in all capital appeals, "[w]hether the sentence of death was imposed under the influence or passion, prejudice, or any other arbitrary factor"). Malone does not challenge the sufficiency of the evidence to support the aggravating circumstances found by his jury; and we find that the evidence was indeed sufficient. Hence this portion of our mandatory sentence review is unproblematic. *See* 21 O.S.2001, § 701.13(C)(2).

during voir dire the prosecutor asked prospective jurors, over and over again, to remember that this case was not just about Malone, it was about Trooper Green and those he left behind. The prosecutor concluded his initial second-stage closing argument, just before defense counsel got up to present his final remarks, by referring back to this voir dire.[243]

¶ 117 If there was any uncertainty that the prosecutor was referring to Trooper Green's family and also Green himself, it was erased by his final second-stage closing argument. The prosecutor addressed the jurors directly about how each of them would be "marked by this case in some way or the other," but also noted, "You'll walk out of here probably later today and you'll go on with your lives." He contrasted this ability of jurors to walk away and move on with the plight of others, who "will not have that option." He continued as follows:

> I pray that you're never involved in a case from the standpoint of losing a family member or being a victim. You can't imagine what it's like to go through. You can't take the law into your own hands as much as [you] may want. You cannot take the law into your own hands. Everything that's been done in this case has been done for you. The victims—they have to rely on the investigators. They got to hope investigators they've never met, don't know anything about—they've got to hope those investigators can get enough information, enough evidence to satisfy twelve people so that some day justice can be done.
>
> They've got to let their loved ones go to Oklahoma City where a doctor opens them up, checks organs so that that doctor someday can testify to a panel of twelve people that they're certain that the cause

of death is a gunshot to the back of the head.

> You can't hire your own attorney to prosecute these cases. You got to rely on a prosecutor that you've never met before. You hope they've got the time and the fortitude to try the case like it ought to be.
>
> But you know the hardest part if you're the victim? The hardest part is right now. Twelve people that didn't know Nikky, twelve people that don't know anything about them other than seeing them on the stand for 15, 20 minutes—is going to decide—make a decision on the person that took Nikky Green's life. Each of those people—and it was difficult. Difficult to take that stand and say the things they had to say. But something that's very important: The law says that we have the right to consider the wishes of the family. Each of those people asked you for the death penalty, and it's appropriate. If you're ever going to set on a case where the death penalty is warranted, you're setting on it right now.
>
> When you go back there to deliberate, there's some strengths on this jury for the death penalty. There's going to be some people, probably, that may have some reservations. Work with them, talk with them; spend some time with them. We've been 15 months waiting on this verdict; if it takes an hour, a day, a week, work with those that may not want the ultimate punishment. This case cries out for it. Anything less would be a travesty.

The prosecutor returned to this same theme again as he began wrapping up his final remarks.[244]

¶ 118 The prosecutor concluded by returning to the theme that the case was about more than Malone; it was about Trooper Nik

---

**243.** The prosecutor concluded:

> I had asked you at the start of this case to keep in mind that this case was about more than Rick Malone; that there was people I could not bring before you, but this case was very much about them as well. I would like you to keep that in mind for the next few minutes.

**244.** He stated,

> I pray you go back there, whatever time it takes. Talk through this case, work with each

other, but come back with the ultimate punishment. This case cries out for the death penalty. We've had one travesty in this case; I pray you don't add a second one to it.

The prosecutor's repeated use of the word "pray" herein seems calculated to recall the idea of the jury's "divine undertaking in upholding and enforcing the laws of our country," which Mrs. Green had described and invoked in her plea that the jury "show no mercy" and "leave the business of mercy for Malone in the hands of the Heavenly Father, where it belongs."

Green. He did this by directly contrasting the situation of Malone, though incarcerated, with the plight of his dead victim. The prosecutor ended Malone's trial with the following comparison:

> And I'd like you to think about this when you go back there—and we heard this from Colleen. This man has human contact. He has known human contact since early morning of December 22nd [sic]. He's got to visit with his wife. He's got to determine how his kids are doing. He's been able to determine what's happening in the world.
>
> Nik Green has had none of that since shortly before 7 that morning. Nik Green will never know human contact again. Nik Green will never read a magazine, a paper. He'll never talk with his wife. He'll never see his kids grow up. He'll never know how they turn out in life.
>
> The death penalty. This case cries out for it. You, the strengths on this jury, bring it back.
>
> I thank you.

Malone's jury was then released to begin its deliberations. The jurors returned two hours later, bringing with them the death penalty verdict for which Mrs. Green and the prosecutor had so powerfully "begged" and "prayed."

¶ 119 Although Malone quotes and challenges these prosecutorial arguments, Proposition XI is not set up as a separate, second-stage prosecutorial misconduct claim.[245] Rather, Malone argues that this Court should consider the State's "egregious misconduct during second stage closing arguments," in conjunction with the numerous other errors committed in connection with the second stage of Malone's case, and conclude that "[t]he confluence of these factors

rendered the verdict of death arbitrary and capricious." Hence this Court declines to narrowly parse these remarks against the backdrop of our extensive prosecutorial misconduct jurisprudence. Instead, we simply conclude that the prosecutor's remarks were egregiously improper and unfairly prejudicial to Malone and that they clearly invited passion, prejudice, and arbitrariness into the jury's sentencing determination in this case.[246]

¶ 120 It was improper for the prosecutor to so blatantly suggest that Malone's jurors should sentence him to death because the family member victims were counting on them to do so. It was improper to so directly and profusely appeal to sympathy for the family member victims. And it was highly improper to seek this sympathy based not only upon the loss of Green, but also by invoking the powerlessness, the indignities, and the depersonalization that the American system of trial by jury imposes upon all crime victims and their surviving families.[247] It was likewise improper to imply that Malone's family members should be compensated for their fifteen-month endurance of this painful process by a death penalty verdict from the jury, and that "[a]nything less would be a travesty." And the prosecutor's comparison of Malone's situation (of limited but continuing "human contact") with that of his dead victim (who "will never know human contact again") is yet *another* version of the infamous, but ever-popular, "three hots and a cot" argument that this Court has so strenuously, but unsuccessfully, sought to eliminate from the Oklahoma prosecutorial repertoire of favorite, death-seeking, closing argument incantations.[248]

¶ 121 Hence the prosecutor's improper remarks within his second-stage closing argument further strengthen and confirm this

---

**245.** Malone's brief does cite many of this Court's cases addressing second-stage, closing-argument prosecutorial misconduct, in support of its claim that the prosecutor's improper argument further necessitates the reversal of Malone's death sentence.

**246.** *See* 21 O.S.2001, § 701.13(C)(1).

**247.** In addition, the prosecutor's remarks about the necessity of an autopsy in a case like this one

improperly suggest that the American system is worthy of ridicule in some regards.

**248.** *See Hooks v. State*, 2001 OK CR 1, ¶ 52 & n. 55, 19 P.3d 294, 316 & n. 55 (noting that this Court has "repeatedly condemned" this argument and citing cases finding various versions of it improper). The State admits in its brief that "[t]his type of argument has been repeatedly condemned by this Court."

Court's finding that the death penalty verdict in this case simply cannot be allowed to stand.[249]

¶ 122 In Proposition XIII, Malone raises an additional cumulative error claim, this time regarding both stages of his trial. This Court has found first-stage error regarding only one issue, namely, Malone's Proposition I challenge to the intoxication jury instructions in his case. Hence this Court's conclusion that the errors discussed in Proposition I were harmless beyond a reasonable doubt resolves Malone's first-stage cumulative error claim as well. Regarding the second stage, this Court has already found that Malone's death sentence must be reversed and that this case should be sent back to the district court for resentencing—thereby rendering moot this second-stage cumulative error claim.

## DECISION

¶ 123 For the reasons discussed in this opinion, the **CONVICTION** of Malone for the first-degree murder of Trooper Nik Green is **AFFIRMED.** Malone's **DEATH SENTENCE,** however, is **REVERSED,** and this case is **REMANDED** to the District Court **FOR RESENTENCING.**[250] Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J. and A. JOHNSON, J.: concur.

LUMPKIN, P.J. and LEWIS, J.: concur in part/dissent in part.

LUMPKIN, Presiding Judge: Concur in Part/Dissent in Part.

¶ 1 I concur in affirming the conviction but dissent to reversing the sentence and re-

manding the case for resentencing for the following reasons.

¶ 2 In Appellant's first proposition of error, he argues he was denied his right to a fair trial because the jury instructions on the defense of voluntary intoxication did not state the applicable law. Specifically, he asserts Instruction No. 38 improperly referenced *"mens rea"* instead of setting forth the specific criminal intent for first degree murder, and that other jury instructions did not cure any error. The majority's reliance on *Coddington v. State* is misplaced as the issue in that case was whether trial court limitations on the testimony of the defense expert deprived the defendant of his constitutional rights to present a defense and confront the State's evidence. This Court found that even without the expert's opinion on the effects of cocaine intoxication, the defense raised sufficient evidence for the trial court to instruct the jury on his defense of voluntary intoxication. *Id.,* 2006 OK CR 34, ¶¶ 40–49, 142 P.3d 437, 449–451. However, the Court did not discuss the standard of review used to determine that the evidence was sufficient to warrant a jury instruction. In the present case, we are concerned with the sufficiency of the jury instructions on voluntary intoxication, not admissibility of expert opinion.

¶ 3 Further, I disagree with the majority's need to restate the legal standard used to determine when an instruction on voluntary intoxication is warranted. Our prior case law is not inconsistent and 48 needlessly confuses the issue. Whether the standard is stated as "sufficient evidence to raise a reasonable doubt as to the defendant's ability to form the requisite criminal intent", *see Taylor v. State,* 2000 OK CR 6, ¶ 19, 998 P.2d 1225, 1230; *Crawford v. State,* 1992 OK CR

---

**249.** The State mocks Malone's assertion that the challenged remarks were egregiously improper by twice jesting that the quoted statements "were so outrageous that no objection was made to any of them." Malone, on the other hand, asserts in Proposition X that the prosecutor's remarks were indeed outrageous and that counsel was constitutionally ineffective for failing to object to any of them. We agree that a large portion of the challenged prosecutorial arguments were "outrageous," to the extent that they were in clear

violation of the precedents of this Court, but decline to resolve this portion of Malone's Proposition X challenge as a separate ineffective assistance claim, based upon this Court's overall resolution of this case.

**250.** We have resolved Malone's Application for Evidentiary Hearing by ruling that Claim Two is DENIED, and Claim One has been rendered MOOT by our resolution of this case as a whole.

62, ¶ 53, 840 P.2d 627, 638, or as "sufficient, *prima facie* evidence [ ] which meets the legal criteria for the defense of voluntary intoxication", *Jackson v. State,* 1998 OK CR 39, ¶ 65, 964 P.2d 875, 892 (*per curiam* ), the requirement is the same.[1] It is not enough for the defense to present evidence of intoxication, the defense must present *prima facie* evidence that the defendant was so utterly intoxicated at the time of the crime that his mental powers were overcome, rendering it impossible for him to form the specific criminal intent or special mental element of the crime.

¶ 4 While I don't fully agree with the majority's analysis of the jury instructions, I do agree that any error was harmless beyond a reasonable doubt. It seems that the majority's admission that no reasonable juror could have concluded that Appellant was so utterly intoxicated at the time of the crime that his mental powers were overcome, rendering it impossible for him form the specific criminal intent or that he did not intend to kill the victim is tantamount to saying that even a "bare *prima facie* " case was not established, in which case Appellant would not have been entitled to the instructions he now finds erroneous.

¶ 5 As for the victim impact evidence, I agree that the trial court erred in failing to hold a hearing to determine the admissibility of the evidence, pursuant to *Cargle,* and that trial court and counsel alike failed in their responsibility to review the victim impact evidence and determine its admissibility prior to the second stage. If a hearing had been held, hopefully it would have prevented the overly emotional victim impact evidence from being presented. However, I find any errors in the admission of the victim impact testimony harmless beyond a reasonable doubt. Evidence of Appellant's cold-blooded execution of Trooper Green, as seen on the Dashcam video, when viewed in conjunction with the evidence in aggravation of Appellant's prior assaults and attempts to escape, show that no reasonable juror would have

chosen any punishment other than death. To say that the death sentence in this case was improperly influenced by the victim impact evidence is to turn a blind eye to the other legally admitted evidence. I find the majority is overly generous in giving Appellant another chance to find one juror who will save him from the death penalty.

¶ 6 Further, I find nothing inappropriate about references in victim impact evidence to God and the Bible. It seems as though courts have become overly phobic of any references to God or the Bible. When we review the works of great American orators and trial lawyers such as Abraham Lincoln, William Jennings Bryan and even the agnostic Clarence Darrow, we find quotations from the Bible and references to God. It is hard to determine exactly when such comments became anathemas, but there is certainly no basis in history for such an approach. It is interesting to note the majority finds such references too emotional when included in victim impact evidence or made by the State. However, defense counsel is criticized for not being emotional enough and no objection is raised to his closing arguments calling on the name of God to save his client. The majority's standard for determining what comments are appropriate or inappropriate seems inconsistent.

¶ 7 As for the claims of ineffective assistance of counsel, it is not the role of this Court to dictate when the defendant and his chosen expert witness must meet, nor is it the proper role of this Court to find it *per se* unreasonable if the meeting has not occurred prior to trial. Each case has its own unique facts and circumstances. While it may be unreasonable in one case for the expert to fail to meet with the defendant before trial, in another trial it might not be unreasonable. In this case, I do not find it indicative of ineffective assistance of counsel.

¶ 8 Further, I do not find counsel's failure to investigate further and present additional mitigation witnesses ineffective. Most capi-

---

**1.** I also disagree with the statement in 48 that the test cited in *Taylor* was previously rejected in *Jackson*. *Jackson* clarified the standard setting forth the quantum of evidence required before the jury can legally consider the defendant's state of intoxication as a defense. In so doing it did not overrule well established case law regarding when the evidence was sufficient to warrant a jury instruction.

tal appeals include an allegation that additional witnesses could have been called. However, the standard of review on appeal is deficient performance plus prejudice. Here, Appellant has failed to show he was prejudiced by the absence of additional mitigating witnesses. Most of the information contained in the affidavits from family and friends attached to the application for evidentiary hearing was presented to the jury. Appellant's sister and wife testified to his background, childhood, school activities, family life, devotion to his wife, mother and children, his good nature and character, and the fact that he was gainfully employed first with various ambulance services as a paramedic and later as a fireman prior to this arrest for drug possession. These same witnesses also described Appellant's depression and drug use stemming from his mother's death and his own divorce as well as his downward spiral into criminal behavior after he began using methamphetamines. The defense also introduced copies of Appellant's generally positive work evaluations from his employment with the fire department and an ambulance service. Much of Appellant's proposed additional mitigation evidence was cumulative to that presented to the jury. Even if trial counsel had presented all of the mitigating witnesses now proposed, there is no reasonable probability that the outcome of the trial would have been different. Therefore, considering all the facts and circumstances, Appellant has failed to show he is entitled to an evidentiary hearing and that counsel's second stage performance was ineffective.

¶ 9 Additionally, the prosecutor's second stage closing argument was not improper. The comments were based on the evidence and inferences therefrom. The majority's condemnation of the argument is merely another attempt to sanitize the defendant but dehumanize the victim.

¶ 10 I find the death sentence in this case was the result of the jury's thorough consideration and evaluation of the evidence, and that decision was not improperly influenced by victim impact evidence or prosecutorial comments. The facts of this case—the cold-blooded execution of a Highway Patrolman, begging for his life—and not the testimony of a family member, have dictated the result. For all of the above reasons, I would affirm the conviction and the death sentence.

LEWIS, Judge, Concur in Part/Dissent in Part.

¶ 1 I concur in affirming Appellant's conviction but dissent to reversing the death sentence. The victim impact testimony in this case was powerful, but it was properly admitted and any error in its admission is harmless beyond a reasonable doubt.

¶ 2 The majority correctly finds that trial counsel rendered deficient performance in failing to investigate mitigation evidence. Considering this omitted mitigation evidence in light of the aggravating circumstances, I see no reasonable probability of a different outcome at trial, and thus no violation of the right to effective assistance of counsel. I would affirm the death sentence.